IN THE SUPREME COURT OF TENNESSEE
AT JACKSON

STATE OF TENNESSEE,            )
**FOR PUBLICATION**

                              )
                                        FI
**LED:  November 8, 1999**
              Appellant        )
                              )
HENRY CIRCUIT
v.                             )              HON. JULIAN P. GUINN,
                              )              JUDGE
                              )
BRENDA ANNE BURNS,             )              No. W1996-00004-SC-R11-CD
                              )
          Appellee             )
                              )

For the Appellant:                              For the Appellee:

Andrew Frazier                          Paul G. Summers
Camden, Tennessee                       Attorney General and Reporter
(At Trial)
                                        Michael C. Moore
David Raybin                            Solicitor General
Nashville, Tennessee
(On Appeal)                             Elizabeth T. Ryan
                                        Assistant Attorney General
                                        Nashville, Tennessee

                                        Robert Radford
                                        District Attorney General

**OPINION**

AFFIRMED AS MODIFIED                              BARKER, J.

OPINION

Defendant/appellee Brenda Burns was tried and convicted of criminal responsibility for the commission of first-degree murder in the death of her ex-husband, Paul Burns.[1] The Court of Criminal Appeals reversed the conviction on the basis that trial counsel was ineffective in failing to interview two potential defense witnesses and present the testimony of those witnesses before the jury. The State filed an Application for Permission to Appeal contesting the intermediate court's reversal of the defendant's conviction on that basis. The defendant filed a Cross-Application for Permission to Appeal raising, among other issues, whether the trial court had committed reversible error by failing to instruct the jury on the lesser-included offenses of facilitation of a felony (*i.e.*, first-degree murder), Tenn. Code Ann. § 39-11-403 (1991), and solicitation to commit a criminal offense (*i.e.*, first-degree murder), Tenn. Code Ann. § 39-12-102 (1991). We granted both Applications in order to address these important issues.

After thoroughly reviewing the facts and law relevant to these issues, we agree that trial counsel's failure to interview the defense witnesses in question and to present their testimony at trial resulted in ineffective representation under the standards set forth in Strickland v. Washington, 466 U.S. 668 (1984), and Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). Furthermore, we find that the trial court's failure to instruct the lesser-included offense of solicitation to commit a criminal offense was error.

FACTS

Paul Burns and the defendant, Brenda Burns, met in Nashville and were married on March 23, 1983. Subsequently, Burns told the defendant that he was formerly a member of the Colombo crime family of New York City and had moved to Tennessee under the federal witness protection program. Later, after the defendant became pregnant, she discovered that Burns had previously been married and had children from that marriage. The couple moved to Donelson, Tennessee, where their son Michael was born. Six months after Michael was born, Burns had a stroke and was no longer able to work.

Shortly thereafter, in 1987, the Burns moved to Camden, Tennessee, where they purchased the Wismer Motel from the defendant's parents and began running it as their source of income. In 1991, the Burns began having marital problems and separated for a while. They reconciled temporarily but were

_____

[1]This Court heard oral argument in this case on April 14, 1999 in Paris, Henry County, Tennessee, as part of the S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

ultimately divorced on August 12, 1994. Pursuant to a marital dissolution agreement, the defendant received the motel, subject to payment of $50,000 to Burns for his share of the equity in the property.

In the spring of 1994, Burns briefly returned to New York City and invited Michael Spadafina, a nephew by his former marriage, to come to Tennessee. Spadafina accepted Burns's offer and moved to Tennessee with his girlfriend, Audrey Coppola, and her two children. For a period of time, Spadafina, Coppola, and Burns lived together near Camden. Spadafina acted as Burns's caretaker, helping with personal and business affairs that Burns could not handle on his own due to the physical limitations resulting from his stroke.

In August 1994, Burns purchased a house and moved out on his own. Nonetheless, Spadafina continued to assist Burns with his personal and business affairs. Furthermore, the two began engaging in a check-kiting scheme,[2] supplementing their income from the ill-gotten gains of that scheme. On October 5, 1994, Burns's house burned down,[3] and he moved back in with Spadafina and Coppola for a time.

In late October 1994, Spadafina and Coppola returned briefly to New York. While there, Spadafina and Coppola invited Vito Licari to move to Tennessee. Spadafina and Licari became friends in 1990 when they were serving time in a medium security penitentiary in New York. Licari accepted the offer and moved in with Spadafina, Coppola, and Burns. Shortly thereafter, Burns moved into a room at the Wismer Motel, and Spadafina, Coppola and Licari moved to another house.

Licari soon joined Spadafina and Burns's check-kiting scheme and began sharing in the profits. That scheme ultimately unraveled when warrants were issued for Burns's arrest, charging him with a series of worthless check offenses. On the morning of Tuesday, December 13, 1994, Licari accompanied Burns to Henry County General Sessions Court for a preliminary appearance on one of the worthless check charges.

---

[2]Burns would open checking accounts at different banks throughout the surrounding counties under a false name. He would then write a check on one account for an amount greater than what he had deposited, deposit that check at the second bank for cash, then split the proceeds with Spadafina. Then they would move on and write a check on the account at the second bank, deposit it for cash at a third bank, split the proceeds, and so on.

[3]There were insinuations that the fire was a result of arson. Spadafina, acting on Burns's behalf, had increased the amount of coverage on the structure and added a separate policy on the contents days before the fire. Arson was never proven, and the insurance company paid the claims.

Meanwhile, ostensibly acting on Burns's behalf, Spadafina delivered to James Orman, an insurance adjuster, an executed and notarized proof of loss form, and collected three settlement checks relating to the fire loss claim on Burns's house. One check was issued in the amount of $20,000, reflecting the amount of insurance coverage originally purchased on the home; one was in the amount of $4,750, reflecting the increased coverage obtained by Burns shortly before the fire; and one was in the amount of $5,000, reflecting the amount of coverage for the contents of the home.

Later in the day, Spadafina[4] accompanied Burns to the bank where he negotiated two of the checks. In the presence of bank officer Tommy Crews, Spadafina told Burns that the $5,000 check had not come in yet, but would arrive the following day. Burns negotiated the other two checks and paid off the mortgage on his house as well as other outstanding loans. In addition, Burns paid $1,139 to Spadafina on an outstanding debt. He also deposited $2,000 into his son Michael's savings account. Because Burns did not have the savings account book with him at the time, Crews gave him a receipt reflecting the deposit of the money.

After these transactions, Spadafina drove Burns back to the motel. Spadafina showed Licari the third check for $5,000 and expressed his intent to cash the check. Later that afternoon, Spadafina and the defendant went to the bank and cashed the check. Three thousand five hundred dollars was applied to pay the defendant's delinquent mortgage payment on the motel. The remaining $1,500 was given to Spadafina.

The testimony at trial diverged as to the circumstances under which the $5,000 check was negotiated. According to Licari, several weeks before Burns's murder, he met with Spadafina and the defendant to discuss murdering Burns. Licari asserted that the three agreed that if Spadafina and Licari would kill Burns, the defendant would pay them $10,000. Licari said that the defendant wanted Burns dead because she hated him, did not want him around their son, and believed that if he were dead, she would not have to pay him the $50,000 she owed him under the divorce settlement. Licari said that the three waited for the insurance checks before killing Burns because Burns owed Spadafina a significant

---

[4]Curiously, while Licari testified that he accompanied Spadafina and Burns to the bank, and testified in some detail about what transpired there, Audrey Coppola testified that Licari did not accompany Spadafina and Burns to the bank to negotiate the checks because Burns did not want him to come along. She testified that Licari was very upset about being excluded from the trip and called his doctor in Jackson, Tennessee requesting a prescription for Valium. When Spadafina returned home, Licari borrowed the car and, accompanied by Coppola's son Robert, drove to Jackson to pick up the prescription. Tommy Crews, the bank branch manager who negotiated the checks for Burns, specifically mentioned Spadafina's presence at the bank the day the checks were negotiated, but never mentioned Licari's presence.

4

amount of money, and Spadafina expected to be paid from the proceeds of the checks. Licari's version of the check negotiation was that he, Spadafina, and the defendant agreed that the defendant would negotiate the $5,000 check. They would allow her to use $3,500 of the check to make her mortgage payment, and she would pay them the remaining $1,500 as a down payment on the murder.

The defendant denied that she was involved in a scheme to have Burns murdered. She said she maintained a friendly relationship with her ex-husband and allowed their son Michael to spend as much time as possible with his father. She testified that on the day of the murder, she received a telephone call from Burns asking her to go with Spadafina to cash the $5,000 check. Burns told her he would lend her $3,500 of the check to pay on the motel's mortgage and instructed her to give the remaining $1,500 to Spadafina. The defendant admitted that she signed Burns's name to the check in question. While she admitted giving the $1,500 to Spadafina, the defendant denied that the $1,500 was a down payment on a contract for murder.

It is undisputed that later that night, Spadafina, Licari, and Burns went to dinner at the Five Star Restaurant in Camden. While driving Burns back to the motel, Spadafina signaled Licari who then started strangling Burns with a clothesline cord. When Licari was unsuccessful in killing Burns, Spadafina pulled the car over, walked around to the passenger side where Burns sat, and slit his throat with a knife, killing him. Spadafina and Licari then pulled the body from the car and dragged it some fifteen or twenty feet from the road where they left it face down on the ground. Before leaving, they rifled through Burns's pockets, taking his personal papers and his wallet, but leaving the key to his motel room.

The men then proceeded to a car wash where they washed the car's interior and exterior. They also cleaned the knife and threw it behind the car wash. Before they left the car wash, Licari tore and threw away the savings deposit receipt reflecting Burns's $2,000 deposit into his son's savings account earlier that day. According to Licari, they then drove to the Wismer Motel and asked to stay in Burns's room while the defendant washed their bloody clothing. While there, Licari said, they gave the defendant the savings account book they took from Burns's pocket. Because he realized that the book did not reflect the deposit made earlier that day, Licari returned to the car wash, retrieved the pieces of the savings deposit receipt, and taped them back together.

5

According to Licari, while he and Spadafina were at the motel, they agreed with the defendant that she would pay the men $800.00 a month on the last Friday of the month until the $10,000 fee was paid in full. The men also agreed that, if questioned by police about Burns's death, they would say they had dinner with Burns and that he had then walked home from the restaurant.

The defendant admitted seeing Spadafina and Licari at approximately 10:00 to 10:15 on the night in question and admitted that they had given her the savings account book. She testified that Burns told her he was opening an account for Michael, so she took the book and put it in a drawer. She denied either that she noticed anything unusual about Spadafina's or Licari's appearances or that she laundered their clothing that night. She reiterated her denial that she had ever made arrangements with Spadafina or Licari to pay them for the murder of Burns.

Burns's body was discovered two days later when school children spotted it from a bus. After police searched the body for identification and found the Wismer Motel key, they went to the Motel and informed the defendant of Burns's death. When they asked the defendant about Burns's associates, she gave them Spadafina and Licari's names.

The police picked up Spadafina and Licari separately and interviewed both men. Remaining faithful to the cover story, Licari told police that he and Spadafina ate dinner with Burns and that Burns walked home afterwards. Spadafina, on the other hand, claimed that Licari became uncontrollable and crazy, dragged Burns from his motel room, and drove away with him in the car. When Licari returned, the car was full of blood, and Licari told Spadafina he killed Burns. Police had Spadafina relate his version of the events to Licari, then told Licari that Spadafina would be released and that he alone would be charged with the murder.

Licari, angry at Spadafina's betrayal, reconsidered and confessed to police that he attempted to strangle Burns but that Spadafina slit Burns's throat. Spadafina eventually admitted that he was in the car when Burns was killed but claimed Licari slit Burns's throat. Although Licari's statement suggested that the men were hired to commit the murder, neither man immediately implicated the defendant in the murder.

Several weeks after his arrest, Licari called an uncle in New York and asked him to contact the defendant regarding "some money she owed him for a job." When the uncle called the defendant, she told him that she had only met Licari once and that she owed him no money. Upon hearing that, Licari turned State's evidence against the defendant. Licari testified that he did not tell police about the defendant sooner, because he thought she would keep her end of the bargain and continue to pay the money he was owed for the murder. Licari freely admitted that he was testifying against the defendant out of revenge.

A Henry County Circuit Court jury found the defendant guilty of first-degree murder. She was sentenced to life imprisonment. Before the hearing on the Motion for New Trial, the defendant hired new counsel to pursue the motion and, failing relief on the motion, to pursue her appeal.

In her Motion for New Trial, the defendant attacked the trial court's failure to instruct the jury sua sponte on the lesser offenses of facilitation of first-degree murder and solicitation of first-degree murder. She also alleged ineffective assistance of counsel in trial counsel's failure to request such instructions, and in counsel's failure to investigate the case adequately and present evidence on her behalf. Specifically, the defendant alleged that counsel was aware of a separate plot to kill Burns but failed to investigate and develop such proof before the jury.

At the hearing on the Motion for New Trial, the defendant presented affidavits from Ruby Blankenship, Kathy Decker, and trial counsel Andrew Frazier. The defendant also presented live testimony from Frazier, Blankenship, the Benton County Sheriff, and agents from the Tennessee Bureau of Investigation (TBI). The testimony indicated that Burns employed Blankenship for approximately two months in 1994. During this employment, Blankenship overheard conversations between Spadafina and Paul Frappolo, Burns's son from a previous marriage, wherein Spadafina and Frappolo plotted to kill Burns so that Frappolo would inherit Burns's interest in the Wismer Motel. Both Blankenship and Decker personally observed Spadafina acting abusively toward Burns. Frappolo was present on these occasions and commented, "let him [Spadafina] kill him [Burns]." The defendant was not present, and her name was never mentioned during these episodes.

Blankenship and her mother, Decker, reported the abusive behavior and threats to officials at the Benton County Sheriff's Department prior to Burns's death, but the Department took no action. After

7

Burns's death, the women reported their observations to the TBI, but investigators told them that the State had all the evidence necessary to prosecute the case, so their testimony would not be needed. TBI Agent Lewis memorialized Blankenship and Decker's report in a written report that was given to defense counsel during pretrial discovery.

Trial counsel testified that he did not pursue the Blankenship and Decker allegations, because they did not exonerate the defendant. Furthermore, neither Blankenship nor Decker was mentioned as State's witness for trial. Counsel admitted, however, that when Blankenship and Decker were interviewed in preparation for the hearing on the Motion for New Trial, their statements tended to show that Frappolo, and not the defendant, may have been responsible for procuring the murder of Burns. Counsel admitted that if he had this information prior to trial he would have used it to defend the charge against the defendant. Regarding the failure to request jury instructions on the lesser offenses of facilitation or solicitation of first-degree murder, counsel testified that because the defendant maintained her innocence, he did not consider that she might be found guilty of a lesser offense.

The trial court refused to accredit the testimony of Blankenship, declined to second guess trial counsel's decision not to pursue the information presented in the TBI memorandum, and denied the Motion for New Trial. On appeal, however, the Court of Criminal Appeals expressed concern with the disreputable character of the State's key witness, Licari, and the weakness of the corroborating evidence. The intermediate court found it "inconceivable" that trial counsel declined to investigate the allegations made by Blankenship and Decker or to present their testimony in Brenda Burns's defense. Accordingly, because the defense had only to raise a reasonable doubt in the minds of the jurors as to the defendant's guilt, the Court of Criminal Appeals held that the defendant had demonstrated a reasonable probability that the result of the trial would have been different had evidence of Frappolo's threats been before the jury. Thus, the Court of Criminal Appeals reversed the defendant's conviction and remanded for a new trial. We affirm that decision as herein modified.

STANDARD OF REVIEW

A trial court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against those findings. See State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). Where appellate review is of purely factual issues, the appellate court will not reweigh or reevaluate the evidence. See Henley, 960 S.W.2d at 579. Moreover,

8

factual questions that involve assessing the credibility of witnesses, or the weight and value to be given their testimony, are matters for resolution by the trial court.

Review of a trial court's application of the law to the facts of a particular case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). Cases that involve mixed questions of law and fact are subject to de novo review. See Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App. 1997). We have determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact, as is the propriety of charging lesser-included offenses; thus, our review of this case is de novo. See Goad v. State, 938 S.W.2d 363 (Tenn. 1996).

### INEFFECTIVE ASSISTANCE OF COUNSEL

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee a criminally accused the right to representation by counsel. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). Both the United States Supreme Court and this Court have recognized that the right to such representation encompasses the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter, 523 S.W.2d at 936.

The overall standard by which effective assistance of counsel is judged is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. Two components must be considered: first, a defendant must show that counsel's performance was deficient in some way; second, a defendant must show that the deficient performance actually prejudiced the defense. See id. at 687; Goad, 938 S.W.2d at 369; Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994). A defendant must establish both prongs of the test; failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on an ineffective assistance claim. See Goad, 938 S.W.2d at 370. The burden is on the defendant to prove these factors by clear and convincing evidence.[5]

---

[5] Under Tenn. Code Ann. § 40-30-210(f) (1997), a post-conviction petitioner seeking relief for constitutional claims is required to prove the allegations "by clear and convincing evidence." Although, in this instance, the claim of ineffective assistance of counsel was raised on direct appeal, the same standard should apply. Accord State v. Anderson, 835 S.W.2d 600 (Tenn. Crim. App. 1992).

No specific criteria judges an attorney's performance. Rather, an objective standard of "reasonableness" is used, and the reviewing court must determine whether this standard has been breached. See Strickland, 466 U.S. at 688; Hellard v. State, 629 S.W.2d 4, 8 (Tenn. 1982). In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689. Conduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another.

Certain broad criteria have been accepted as guidelines for effective representation. In Baxter, we cited with approval the duties and criteria included in the American Bar Association Standards for the Defense Function:

> (1) Counsel should confer with his client without delay and as often as necessary to elicit matters of defense, or to ascertain that potential defenses are unavailable. Counsel should discuss fully potential strategies and tactical choices with his client.
>
> (2) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. . . . Counsel should also be concerned with the accused's right to be released from custody pending trial, and be prepared, where appropriate, to make motions for a pre-trial psychiatric examination or for the suppression of evidence.
>
> (3) Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

523 S.W.2d at 932-33 (quoting United States v. DeCoster, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973)).

Pertinent to the issue raised in this case is the duty to investigate.

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 691; see also United States v. Beasley, 491 F.2d 687, 696 (6th Cir. 1974); DeCoster, 487 F.2d at 1203-04; Baxter, 523 S.W.2d at 933. Failure to conduct a reasonable investigation constitutes deficient performance. See Austin v. Bell, 126 F.3d 843, 848 (6th Cir. 1997).

10

In this case, counsel knew prior to trial that he faced testimony from a disreputable accomplice who would implicate his client as the instigator of the murder of her ex-husband. Although his client denied any involvement in her husband's murder, the accomplice stood to gain little by his testimony against her. On the other hand, counsel also had available a TBI memorandum containing information concerning a wholly separate plot to kill Burns. Included in this report were the names of two witnesses, Blankenship and Decker. If these witnesses had substantiated the existence of a separate conspiracy to kill Burns, the defense could have offered the jury an alternative theory about how Burns was killed. This Court cannot fathom why counsel chose to ignore this avenue of defense. At a minimum, the failure to investigate this possibility constitutes a deficiency in counsel's representation.

Nevertheless, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. An error must be prejudicial to the defense before reversal on this basis will be warranted. See id. at 692. The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Simply put, the error must be of a degree that deprives the defendant of a fair trial and calls into question the reliability of the outcome. A reasonable probability of being found guilty of a lesser charge satisfies the prejudice prong of Strickland. See Hicks, 983 S.W.2d at 246; State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991).

The testimony of Blankenship and affidavits from both Blankenship and Decker were introduced at the hearing on the Motion for New Trial. The information gleaned from their testimony indicated that Spadafina and Frappolo openly discussed plans to kill Burns and were observed on several occasions making verbal threats and physical assaults against him. Evidence also showed that the two women approached law enforcement officials about threats on Burns's life prior to the actual murder, lending credibility to their later testimony about such threats.[6]

---

[6]In our view, the evidence preponderates against the trial court's diminution of Blankenship's credibility. Whatever the court's impression of her on the witness stand, her prior reports to law enforcement and the additional affidavit from Decker cannot be ignored.

We agree with our esteemed colleagues on the Court of Criminal Appeals that Licari, the State's primary witness, acted with questionable motives and repute. Furthermore, the corroborating evidence, consisting solely of testimony that the defendant negotiated a check made out to Burns and possessed her son's savings passbook, was scant. Given the minimal corroborating evidence, we believe a reasonable possibility exists that admission of the evidence of an alternative plot by Spadafina and Frappolo to kill Burns would have raised a reasonable doubt in the jurors' minds as to the defendant's involvement in the scheme. The defendant's conviction is therefore reversed, and the case remanded to the trial court for a new trial.

## LESSER-INCLUDED OFFENSE INSTRUCTIONS

Although the issue of ineffective assistance of counsel is dispositive, we choose also to discuss the trial court's failure to charge the lesser offenses of facilitation of a felony (first-degree murder) and solicitation of first-degree murder to provide guidance in the event of a retrial. The defendant argues that, because she was charged with criminal responsibility for commission of an offense, facilitation was necessarily a lesser-included offense that should have been instructed. Furthermore, based on the language of the criminal responsibility statute, Tenn. Code Ann. § 39-11-403 (1997), the language of the defendant's indictment, and the facts that developed at trial, the defendant argues that solicitation to commit a felony was also a lesser-included offense that merited instruction. We agree that both facilitation and solicitation were lesser-included offenses of criminal responsibility for first-degree murder as charged in the defendant's indictment. We find error, however, only as to the failure to charge solicitation.

An understanding of the development of the law related to lesser-included offense instructions is necessary to our analysis of this issue. In Beck v. Alabama, 447 U.S. 625 (1980), the United States Supreme Court succinctly summarized the value and purpose of lesser-included offense instructions.

> At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged. This rule originally developed as an aid to the prosecution in cases in which the proof failed to establish some element of the crime charged. But it has long been recognized that it can also be beneficial to the defendant because it affords the jury a less drastic

12

> alternative than the choice between conviction of the
> offense charged and acquittal. . . . [P]roviding the jury with
> the "third option" of convicting on a lesser included offense
> ensures that the jury will accord the defendant the full
> benefit of the reasonable-doubt standard.

Id. at 633-34 (citations and footnotes omitted).

A trial court's duty to charge juries as to the law of each offense "included" in an indictment has been statutorily mandated in this State for some time. See Tenn. Code Ann. § 40-18-110 (1997) ("section 110"). We recently interpreted this provision to mean that "a trial court must instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense." State v. Langford, 994 S.W.2d 126, 128 (Tenn. 1999) (citing State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998)); see also Tenn. R. Crim. P. 31(c) ("The defendant may be found guilty of an offense necessarily included in the offense charged . . . ."). This mandate to charge lesser-included offenses applies whether or not a defendant requests such an instruction.

In defining a lesser-included offense, this Court described an offense as "necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but are not congruent with, all the elements of the lesser." Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979). This definition followed a statutory elements approach, wherein the determination of whether an offense was included in another for purposes of jury instruction involved a strict comparison between the statutory elements of the offense charged in the indictment with the elements of the lesser offense at issue. Under this approach, an offense is not "necessarily included" in another unless the elements of the lesser offense are a subset of the elements of the charged offense. See Schmuck v. United States, 489 U.S. 705, 716 (1989). In other words, the lesser offense may not require proof of any element not included in the greater offense as charged in the indictment.

The definition of lesser-included offenses was briefly expanded to include lesser "grades" or "classes" of offenses. See State v. Trusty, 919 S.W.2d 305 (Tenn. 1996). This expansion was based on the perception that, under a strict application of

13

the lesser-included offense doctrine espoused in Howard, some offenses that were traditionally considered lesser-included offenses at common law were no longer lesser-included offenses under the redefinition of offenses in the 1989 Criminal Sentencing Reform Act ("the 1989 Act").[7] The expansion of the definition to include lesser "grades" or "classes" was based on the language of section 110 that provided "[i]t is the duty of all judges charging juries in cases of criminal prosecutions for any felony wherein two (2) or more *grades* or *classes* of offense may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment . . . ." Tenn. Code Ann. § 40-18-110 (1997) (emphasis added). Trusty defined lesser "grades" or classes" of offenses as those offenses established by the legislature and determined by looking at the offenses set forth in a particular statutory chapter and part. See State v. Cleveland, 959 S.W.2d 548, 553 (Tenn. 1997).

The expanded definition of lesser-included offenses was based upon the premise that the terms "grades" and "classes" had a meaning separate and distinct from the term "lesser-included." However, historical research into the meaning of those terms as originally adopted reveals that the terms were used synonymously, without distinction. See Acts of 1877, Ch. 85, § 1; see also Good v. State, 69 Tenn. 293 (Tenn. 1878). Thus, the Trusty Court wrongly assumed that the terms had any distinct meaning separate and apart from "lesser-included."

The expanded definition in Trusty also proved unworkable. Under the 1989 Act, any particular chapter or part of the Code might contain myriad offenses that, while related in a general sense, were distinct in nature. For example, while Part 5 of Chapter 13 of the Code addresses sexual offenses in general, it includes offenses as diverse as rape, sexual battery, public indecency, and prostitution.[8] It is ludicrous to suggest that a jury considering a charge of aggravated rape should receive an

---

[7]Of particular concern was whether the offense of voluntary manslaughter could still be a lesser-included offense of first-degree murder.

[8]Similarly, Part 3 of Chapter 17 prohibits offenses as diverse as riot, disorderly conduct, disruption of a meeting or procession, obstruction of a highway or other passageway, harassment, civil rights intimidation, public intoxication, desecration of a venerated object, abuse of corpse, civil disorder, stalking, and noise control at sport shooting ranges.

14

instruction on prostitution simply because this lesser offense is included within the same chapter and part.

That criminal provisions are scattered throughout the Tennessee Code also proved problematic.[9] Moreover, the Trusty analysis simply did not apply in many cases. See State v. Ealey, 959 S.W.2d 605, 611 (Tenn. Crim. App. 1997). As the cases developed in the trial courts, it became apparent that because the requirement for instruction of lesser offenses was mandatory under section 110, Trusty's directive to instruct lesser "grades" or classes" of offenses could conceivably confront a defendant with a jury instruction for an offense for which he or she had no notice. This would constitute a violation of our own constitutional requirement that a defendant be given notice of the offenses with which he or she is charged. Tenn. Const. Art. I, § 14. Thus, in State v. Dominy, – S.W.2d – (Tenn. 1999) (filed simultaneously with this opinion), we overruled the language in Trusty that purported to require jury instructions and to allow convictions for lesser "grades" or "classes" of offenses in addition to "lesser-included" offenses.

The problem after Dominy remains this: under our present statutory scheme, the State has broad discretion to charge the offense it deems appropriate. Often, this is the most serious offense conceivable even though the evidence may not be clear as to one or more elements of the offense. Application of the statutory elements test of Howard may preclude instruction on a lesser related offense where that lesser offense contains an element not required for the greater offense. Thus, in some cases, application of the Howard analysis may deprive the defendant of the right to present a defense.

The classic example is where the State has charged rape and proves sexual battery, but the evidence does not support a finding of penetration, a necessary element of rape. Under Howard, technically a defendant could not get an instruction

_____

[9]See, e.g., Tenn. Code Ann. § 2-19-115 (1994) (voter intimidation); Tenn. Code Ann. § 11-5-108 (1992) (unlawful mutilation of a cave or cavern); Tenn. Code Ann. § 46-2-105 (1993) (wilful destruction of a gravestone); Tenn. Code Ann. § 55-10-205 (1998) (reckless driving); Tenn. Code Ann. § 55-10-401 (1998) (DUI).

on sexual battery, because that offense requires the additional element that the touching be for the purpose of sexual arousal or gratification. Such a scenario forces a jury into an "all or nothing" decision that, unfortunately, is likely to be resolved against the defendant, who is clearly guilty of "something."

A number of jurisdictions have resolved this dilemma by adopting either verbatim or modified versions of the American Law Institute's Model Penal Code definition of "lesser-included" offenses.[10] See Model Penal Code § 1.07(4) (1980). Under the Model Penal Code definition, an offense is "included" when

> (a) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
>
> (b) it consists of an attempt or solicitation to commit the offense charged or to commit an offense otherwise included therein; or
>
> (c) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.

We interpret the first part of the definition to be consistent with Howard's statutory elements test. The second part of the definition, attempt or solicitation, applies to situations in which the defendant attempted to commit or solicited another to commit the crime charged or a lesser-included offense, but the proof fails to show that the crime was completed. We interpret the third part of the definition, lesser injury or risk of injury or lesser culpability, to include offenses that are still logically related to the charged offense in terms of the character and nature of the offense but in which the injury or risk of injury, damage, or culpability is of a lesser degree than that required for the greater offense.

Based on our interpretation of its terms, we find that the Model Penal Code approach, as hereinafter modified, is logical and consistent with the structure of our

---

[10]See, e.g., Ala. Code § 13A-1-9 (1994); Ark. Code Ann. § 5-1-110(b) (1997); Colo. Rev. Stat. § 18-1-408(5) (1999); Del. Code Ann. tit. 11, § 206(b) (1995); Ga. Code Ann. § 16-1-6 (1999); Haw. Rev. Stat. § 701-109(4) (1985); Ky. Rev. Stat. § 505.020 (2) (1990); Mont. Code Ann. § 46-1-202 (8) (1999); N.J. Rev. Stat. § 2C:1-8(d) (1995); Tex Code Crim. P. Ann. art. 37.09 (1981). See generally Russell G. Donaldson, Lesser-Related State Offense Instructions: Modern Status, 50 A.L.R.4th 1081 (1986 & 1998 Supp.).

own criminal code.[11]  The Tennessee criminal code is structured to define offenses and assign degrees of punishment by determining the completion of the crime, the culpability of the individual criminal actor, and the degree of perceived harm to the victim or society as a whole.  The crime carried to completion, the more responsible party, and the more serious offenses merit harsher penalties.  In a general sense, the various criminal offenses can be visualized as "layers," with the most serious, culpable versions of each type of crime at the top, meriting the most severe punishment.  Correspondingly, underneath are the less serious versions in decreasing order of seriousness and culpability and with consequently less serious punishment.  We find that the following definition of "lesser-included" offenses adapts well to the structure of our Code, and we therefore adopt it for use in our trial courts:

> An offense is a lesser-included offense if:
>
> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
> > (1) a different mental state indicating a lesser kind of culpability; and/or
> >
> > (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of
>
> > (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
> >
> > (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
> >
> > (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Part (a) of this test defines lesser-included offense using a statutory elements approach consistent with Howard.  Part (b) of the test modifies the statutory elements

---

[11]This is not surprising, because the 1989 Act was patterned in large part upon the Model Penal Code.  State v. Latham, 910 S.W.2d 892, 895 (Tenn. Crim. App. 1995).

test by creating two exceptions to the requirement that all the statutory elements of a lesser-included offense must be included within the statutory elements of the offense charged. Under part (b), the lesser-included offense may contain a statutory element or elements establishing: (1) a different mental state indicating a lesser kind of culpability, and/or (2) a less serious harm or risk of harm to the same person, property or public interest. While conceptually related to paragraph (c) of the Model Penal Code test, part (b) of our test is narrower in that the statutory elements remain the focus of the inquiry. Part (c) of the test specifically includes the inchoate offenses of facilitation, attempt, and solicitation as lesser-included offenses when the evidence in the case would support a conviction for those offenses. The structure of our Code indicates that the Legislature viewed these as lesser offenses of the specific crime charged. See Tenn. Code Ann. § 39-11-403 (1991) (facilitation of a felony is an offense of the classification next below the felony facilitated by the person so charged); Tenn. Code Ann. § 39-12-107 (1991) (criminal attempt is an offense one classification lower than the most serious crime attempted; solicitation is an offense two classifications lower than the most serious offense solicited). We choose to include these offenses in our definition so as to provide clear, comprehensive guidance for our trial courts to use in their determination of lesser-included offenses.[12]

Having stated the test for determining whether a particular offense is a lesser-included offense of another, we must acknowledge that our inquiry continues. Whether a lesser-included offense must be charged in a jury instruction is a two-part inquiry. First, the trial court must apply the new test to determine whether a particular lesser offense is included in the greater charged offense. If a lesser offense is not included in the offense charged, then an instruction should not be given, regardless of whether evidence supports it. If, however, the trial court concludes that a lesser offense is included in the charged offense, the question remains whether the evidence justifies a jury instruction on such lesser offense.

---

[12]We hasten to add that trial courts should also consider any offenses that presently or in the future are expressly designated lesser-included offenses. See, e.g., Tenn. Code Ann. § 39-15-401(d) (Supp. 1998) (child abuse or neglect is a lesser-included offense of any kind of homicide, statutory assault, or sexual offense if the victim is a child and the evidence supports such a charge); Tenn. Code Ann. § 55-10-415(c) (1998) (the offense of underage driving while impaired is a lesser-included offense of driving while intoxicated).

Although section 110(c) appears to mandate jury instructions on all offenses included in an indictment regardless of whether evidence in the record supports such a charge, this Court has consistently required some factual basis for submitting an instruction on an included offense to the jury. See State v. Stephenson, 878 S.W.2d 530, 549-50 (Tenn. 1994); State v. Boyd, 797 S.W.2d 589, 593 (Tenn. 1990); State v. Mellons 557 S.W.2d 497, 499 (Tenn. 1977). The mere existence of a lesser offense to a charged offense is not sufficient alone to warrant a charge on that offense. Whether or not a particular lesser-included offense should be charged to the jury depends on whether proof in the record would support the lesser charge.

This case presents this Court with the opportunity to clarify when instructions on lesser-included offenses should be given. The Model Penal Code incorporates a rational basis test for determining when to instruct on lesser-included offenses. Section 1.07(5) of the Model Penal Code provides: "The Court shall not be obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." A number of jurisdictions have adopted this provision verbatim by legislation,[13] while other jurisdictions have adopted the rational basis test by judicial decision.[14]

This Court has not previously adopted the rational basis test. In view of the broad language of our statute requiring a charge on lesser-included offenses, Tenn. Code Ann. § 40-18-110(a) (1990), we think that requiring a rational basis for a verdict acquitting the defendant of the offense charged, in addition to requiring a rational basis for a charge on a lesser-included offense, unreasonably limits the circumstances under which a defendant is entitled to a lesser-included offense instruction.

---

[13]See, e.g., Ark. Code Ann. § 5-1-110(c) (1997); Colo. Rev. Stat. § 18-1-408(6) (1999); Del. Code Ann. tit. 11, § 206(c) (1995); Haw. Rev. Stat. § 701-109 (5) (1985); Mo. Rev. Stat. § 556.046.2 (1999); Utah Code Ann. § 76-1-402 (4) (1995).

[14]See, e.g., State v. Williams, 503 N.W.2d 561, 565 (Neb. 1993) ("[O]nce it is determined that an offense is a lesser-included one, a court must examine the evidence to determine whether it justifies an instruction on the lesser-included offense by producing a rational basis for a verdict acquitting defendant of the offense charged and convicting him of the lesser offense.") (citations omitted); State v. Berlin, 947 P.2d 700, 705 (Wash. 1997) ("If the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater, a lesser-included offense instruction should be given.") (citation omitted).

19

The appellate courts of this State have not, however, been very clear in providing guidance to trial courts regarding when lesser-included offense instructions should be given.  In Templeton v. State, 240 S.W. 789, 791 (Tenn. 1922), the Court applied a very broad test simply analyzing whether the facts were at all susceptible of supporting an inference of guilt of the lesser charge.  See also State v. Vance, 888 S.W.2d 776, 780-81 (Tenn. Crim. App. 1994).  In Strader v. State, 362 S.W.2d 224, 228-29 (Tenn. 1962), the Court held that the lesser-included offense instruction is required "where the evidence, upon any view the jury may take of it, permits an inference of guilt as to such lesser-included offenses."  More recently, we restated the test as follows:  "a trial court must instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense."  Langford, 994 S.W.2d at 128 (quoting Bolden, 979 S.W.2d at 593); see also Cleveland, 959 S.W.2d at 553.  An analysis of Langford, Bolden, and Cleveland reveals that this "legally sufficient" language was derived from State v. Trusty, 919 S.W.2d at 305 n. 5.  Trusty, in turn, relied on Johnson v. State, 531 S.W.2d 558 (Tenn. 1975); Owen v. State, 221 S.W.2d 515 (1949); and Powers v. State, 97 S.W. 815 (1906).  Johnson, however, did not require that evidence be legally sufficient to support a conviction on the lesser-included offense.  Johnson instead held that defendant is entitled to lesser-included offense instructions "if there is any evidence which reasonable minds could accept as to any such [lesser] offenses."  531 S.W.2d at 559 (emphasis added).  Conversely, Owen and Powers stood for the proposition that if no evidence that would support a finding of guilt of the lesser charge, then the charge should not be given. See Owen, 221 S.W.2d at 520; Powers, 97 S.W. at 87.[15]

When read together, our prior decisions, such as Templeton, Strader, and Johnson, and our recent decisions, such as Trusty, Cleveland, Bolden, and Langford, support the application of a two-step analysis for determining whether a lesser-included offense instruction should be given.  First, the trial court must determine whether any

---

[15] See also Boyd, 797 S.W.2d at 593 (concluding in first-degree murder case that where there was no evidence the killing was committed upon a sudden heat produce by adequate provocation, it was not error to fail to charge voluntary manslaughter); State v. Spadafina, 952 S.W.2d 444, 452 (Tenn. Crim. App. 1996) (determining in first-degree murder case that instruction on facilitation of first-degree murder was not supported by the proof where the evidence showed unequivocally that the defendant was a principal in the commission of the offense); State v. Lewis, 978 S.W.2d 558, 565 (Tenn. Crim. App. 1997) (finding in felony reckless endangerment case that instruction on misdemeanor reckless endangerment was unnecessary where the proof showed unequivocally that the offense was committed by the use of a deadly weapon, an automobile).

20

evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense. This two-step analysis is practical, can be easily applied by the trial courts, and remains broad enough to preserve both the State's and defendant's rights to consider any lesser-included offenses fairly raised by the proof.

We now apply the above-stated tests to this case to determine whether the jury should have received instructions on the lesser-included offenses of facilitation and solicitation.

### Facilitation of a felony as a lesser-included offense

The defendant claims reversible error in the trial court's failure to charge the jury on the offense of facilitation of a felony. The original indictment charged:

> [Defendant] intentionally, deliberately and with premeditation act[ing] to promote or assist the commission of first-degree murder, or act[ing] to benefit in the proceeds or results of the commission of first-degree murder, by soliciting, directing, aiding, or attempting to aid MICHAEL SPADAFINA and VITO LICARI in the intentional, deliberate and premeditated killing of PAUL A. BURNS on or about the 13th day of December, 1994, thereby becoming criminally responsible for the aforesaid conduct of MICHAEL SPADAFINA and VITO LICARI (T.C.A. 39-11-402) and committing the offense of First-degree MURDER, in violation of T.C.A. 39-13-202(a)(1), against the peace and dignity of the State of Tennessee.

The indictment thus expressly charged the defendant with first-degree premeditated murder, based upon a theory of criminal responsibility.

Part 4 of Chapter 11 of Title 39 of the Tennessee Code sets forth the various means for incurring criminal liability. A person is punishable to the same degree as a principal offender if "the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (1997). "Each party to an offense may be charged with commission of the offense." § 39-11-401(b).

21

A person is criminally responsible for the conduct of <u>another</u> person if that person, acting with the culpability required for the offense, uses an innocent or irresponsible person to commit an offense, <u>see</u> Tenn. Code Ann. § 39-11-402(1) (1997); or, "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person *solicits*, directs, aids, or attempts to aid another person to commit the offense," § 39-11-402(2) (emphasis added); or, having a duty (either statutorily imposed or voluntarily undertaken) to prevent the commission of an offense, fails to make a reasonable effort to do so, with intent by neglecting such a duty to benefit in the proceeds or results of the offense, or to help in the commission of the offense, <u>see</u> § 39-11-402(3).

Facilitation of a felony is a lesser degree of criminal responsibility than that codified at Tenn. Code Ann. § 39-11-402. It is defined as follows:

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Tenn. Code Ann. § 39-11-403(a) (1997). Facilitation is punishable as an offense of one class lower than the felony so facilitated. <u>See</u> § 39-11-403(b).[16]

First, we note that the Sentencing Commission Comments expressly characterize facilitation as "a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party."[17] Tenn. Code Ann. § 39-11-403 (1997) Sentencing Commission Comments. In addition, first-degree premeditated murder based upon the theory of criminal responsibility includes all the elements of facilitation of first-degree murder except that first-degree murder requires an intentional mental state and facilitation requires a knowing mental state. Pursuant to Tenn. Code Ann. § 39-11-301(a)(2) (1997), however, proof that a person acted knowingly is established if there is also proof that the person acted intentionally. Therefore, facilitation meets the definition of a lesser-included offense under part (a) of our newly adopted test. In addition, facilitation of an offense is expressly included as a lesser-included offense under part (c) of the test. We therefore conclude that, under either part (a) or part (c) of the lesser-included offense definition adopted above, facilitation was a lesser-included offense of the charged

---

[16]Other types of criminal responsibility covered in Part 4 of Section 11 in Title 39 are corporate liability, <u>see</u> Tenn. Code Ann. § 39-11-404 (1997), individual liability for corporate conduct, <u>see</u> Tenn. Code Ann. § 39-11-405 (1997), and accessory after the fact, <u>see</u> Tenn. Code Ann. § 39-11-411 (1997).

[17]"This Court and intermediate courts have often relied on [C]ommission [C]omments as 'quasi-authority.'" <u>State v. Blouvett</u>, 904 S.W.2d 111, 113 (Tenn. 1995) (quoting <u>State v. Jones</u>, 883 S.W.2d 597, 600 (Tenn. 1994).

offense in this case. Compare Commonwealth v. Day, 983 S.W.2d 505, 509 n.2 (Ky. 1999) ("Generally, criminal facilitation is a lesser included offense when the defendant is charged with being an accomplice to an offense, not the principal offender."); Chumbler v. Commonwealth, 905 S.W.2d 488, 499 (Ky. 1995); see also State v. Lewis, 919 S.W.2d 62, 67 (Tenn. Crim. App. 1995) ("We must conclude that virtually every time one is charged with a felony by way of criminal responsibility for the conduct of another, facilitation of the felony would be a lesser included offense."), overruled on other grounds State v. Williams, 977 S.W.2d 101,106 n.7 (Tenn. 1998).

Having concluded that facilitation was a lesser-included offense of criminal responsibility for first-degree murder as that offense was charged in the indictment, we shall attempt to provide guidance to the trial court concerning instruction upon retrial. The facts developed at trial were susceptible of only two interpretations. Licari testified that the defendant openly discussed hiring him and Spadafina to kill her ex-husband, that they agreed upon a price, and that the defendant gave them an "advance" in the amount of $1,500 taken from Burns's forged check. The defendant, on the other hand, denied knowing Licari other than meeting him briefly the night Burns was murdered. She denied soliciting either him or Spadafina to kill her ex-husband, and she denied that the $1,500 she gave Spadafina was for the purpose of making a down payment on the murder for hire. Furthermore, she testified that she had Burns's permission to cash the $5,000 check. Therefore, either she was guilty of first-degree murder by soliciting Licari and Spadafina to kill Burns, or she was wholly innocent of any wrongdoing.

The defendant now argues that there was a third interpretation: while she did not directly solicit the murder of Burns, she was aware that it might occur and that she facilitated its commission by forging Burns's name to the check so that the killers might flee the jurisdiction. Thus, she had knowledge for purposes of a finding of facilitation but not the intent required to hold her liable as a principal. This argument's flaw is that absolutely no evidence exists upon which a reasonable juror could reach such a conclusion. Thus, no instruction on the lesser-included offense of facilitation was warranted. See Boyd, 797 S.W.2d at 593; Owens, 221 S.W.2d at 520; Powers, 97 S.W. at 87. While we agree with the Court of Criminal Appeals that it was not error to fail to charge facilitation as a lesser-included offense of first-degree murder under the facts as they developed at the first trial, we caution the trial court that it should conduct an independent evaluation of the facts as they are developed at the new trial and decide whether or not to charge facilitation based on those facts.

23

<u>Solicitation as a lesser-included offense</u>

The defendant also complains of the trial court's failure to charge the jury on the offense of solicitation of first-degree murder. The offense of solicitation is defined as follows:

> Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

Tenn. Code Ann. § 39-12-102(a) (1997). We note that as charged in the indictment, first-degree premeditated murder based upon the theory of criminal responsibility specifically included solicitation as one possible means of the commission of this offense. Therefore solicitation is a lesser-included offense under part (a) of the test enunciated today.

Furthermore, under part (c) of the lesser-included offense definition adopted above, solicitation to commit a crime is expressly recognized as a lesser-included offense of the charged offense. It follows that under either part (a) or part (c) of the definition, solicitation to commit first-degree murder was a lesser-included offense in this case.

Having concluded that solicitation was a lesser-included offense of criminal responsibility for first-degree murder as that offense was charged in the indictment, we consider whether it should have been instructed. Clearly direct evidence from Licari indicated that the defendant solicited him and Spadafina to kill Burns. As we have recently noted:

> "[T]he evidence may show that the defendant is guilty of some intermediate offense included within, but lesser than, the crime charged. A trial court's failure to inform the jury of its option to find the defendant guilty of the lesser offense would impair the jury's truth-ascertainment function. Consequently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit this would force the jury to make an 'all or nothing' choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence."

<u>Bolden</u>, 979 S.W.2d at 593 (quoting <u>People v. Barton</u>, 906 P.2d 531, 536 (Cal. 1995)). Whether sufficient evidence supports a conviction of the charged offense does not affect the trial court's duty to instruct on the lesser offense if evidence also supports a finding of guilt on the lesser offense. The jury, not the judge, performs the function of fact-finder. We conclude that it was error to fail to charge the offense of solicitation. Again, however, the facts as they develop at the defendant's new trial will determine whether an instruction on solicitation is then warranted.

24

## CONCLUSION

After exhaustively analyzing the facts and law pertinent to the case, we conclude that the defendant was deprived of the effective assistance of counsel when counsel failed to investigate adequately and present evidence concerning whether Paul Frappolo, and not the defendant, may have been responsible for soliciting Burns's death. For purposes of retrial, we note that the offenses of facilitation and solicitation are lesser-included offenses of criminal responsibility for first-degree murder as charged in the defendant's indictment, and we instruct the trial court to consider jury instructions on those offenses if legally sufficient evidence at trial supports convictions for these offenses.

_____
WILLIAM M. BARKER, JUSTICE


Concur:
Anderson, C.J.
Birch, Drowota, Holder, J.J.

25