IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2012

**JAMIEL D. WILLIAMS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Williamson County**
**No. CR114557      Timothy Easter, Judge**

**No. M2011-01316-CCA-R3-PC - Filed May 30, 2012**

The petitioner, Jamiel D. Williams, appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he received effective assistance of counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Christina Ferrell Daugherty, Franklin, Tennessee, for the appellant, Jamiel D. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Kim R. Helper, District Attorney General; and Derek K. Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Following his transfer from juvenile court, the petitioner was convicted by a Williamson County Circuit Court jury of first degree premeditated murder and was sentenced to life imprisonment. His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. State v. Jamiel D. Williams, No. M2007-01666-CCA-R3-CD, 2008 WL 2200008, at *1 (Tenn. Crim. App. May 27, 2008), perm. to appeal denied (Tenn. Dec. 8, 2008).

Our direct appeal opinion reveals that the defendant's conviction was based on his April 26, 2005 shooting of the victim, Aaron Jones, on Ninth Avenue in Franklin. According

to the State's proof at trial, a group of individuals, including the defendant, who was seventeen at the time, gathered outside the home of Trent Covington to watch the victim and Cory Esmon fight. Id. at *2-4. The victim and Esmon had been in an earlier altercation over a girl, and there was testimony that the victim had pulled a knife on Esmon and that the defendant had threatened to "get [his] folks" so that the parties could "have this out." Id. at *3. In the physical fight that followed at Covington's home, the victim jumped on Esmon and beat him until Esmon conceded defeat. Eyewitnesses testified that the victim stopped fighting and was about to get up from the ground when the defendant suddenly jumped from the porch of Covington's home and fired multiple gunshots at the victim, killing him. Id. at *4.

On November 20, 2009, the petitioner filed a *pro se* petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Following the appointment of post-conviction counsel, he filed an amended petition on October 27, 2010, in which he alleged that trial counsel was deficient, thereby prejudicing his case, in the following ways: by failing to file a motion in limine to exclude Tennessee Rule of Evidence 404(b) evidence of the petitioner's possible gang affiliation; by failing to object to the introduction of Covington's statement as impeachment of his in-court testimony; by failing to adequately investigate the case or call essential witnesses at trial; by failing to inform the petitioner of his right to testify at his juvenile transfer hearing or to adequately explain to him the elements of first degree murder and the consequences of a first degree murder conviction; by failing to object to the introduction of physical evidence; and by failing to argue the facts against premeditation to the jury.

At the evidentiary hearing, the petitioner testified that trial counsel, who was retained by his family, visited him about six times while he was in juvenile detention and another three times after he had been transferred to circuit court. He said that counsel explained what a juvenile transfer hearing was but never told him that he had the right to testify and call witnesses at the hearing. The petitioner stated that he would have chosen to testify on his own behalf at the hearing had he been given a chance to do so.

The petitioner testified that he maintained from the beginning that he was not guilty and provided counsel with the names of several eyewitnesses, including Marquis Grayson, who could have testified that he was not the person who shot the victim. Counsel, however, told him that his witnesses' status as gang members would only hurt his case. Counsel also talked him out of testifying in his own defense by telling him that he would not be able to withstand cross-examination. The petitioner complained that counsel's failure to call his witnesses or to let him testify resulted in his conviction for first degree murder despite the fact that he was innocent of the crime. The petitioner claimed that he "followed [counsel's] influence" and therefore had not understood what he was doing when he assured the trial

court that he understood his rights and that it was his decision not to testify.

The petitioner acknowledged that an "Affidavit of Jamiel Williams," which was admitted as an exhibit at the evidentiary hearing, contained his signature. He claimed, however, that he had no memory of signing it, did not understand what it contained, and must have signed solely because counsel told him to do so. The affidavit stated, among other things, that the petitioner had met with counsel "for many hours"; that he and counsel had "thoroughly discussed" the evidence against him, the charge he faced, and his defense theory; that he understood that he would spend the rest of his life in prison if convicted of the offense; that the petitioner maintained he did not kill the victim and wished to proceed with an identity defense, despite counsel's having informed him that the facts suggested that a defense of self-defense or at least a mitigation of the culpable mental state might be available to him; and that the petitioner was pleased with counsel's representation. The affidavit also stated that the petitioner had rejected a plea deal of fifteen years for second degree murder.

Trial counsel, who was licensed to practice law in 1998, testified that he had participated in several first degree murder trials and handled several juvenile transfer hearings by the time he took the petitioner's case. He said he took great care in explaining things to the petitioner, including the transfer proceedings, his right to testify at the transfer hearing, and the consequences of his transfer to circuit court. Counsel stated that he essentially treated the transfer hearing as a preliminary hearing because he believed, based on his experience and the facts of the case, that the probability of transfer was very high. He said that the petitioner's "manner and affect" were not always appropriate, but he saw no reason to request an independent mental evaluation because the petitioner had been found competent in an evaluation performed as part of his "JCCO," and neither the petitioner's brother nor mother ever indicated that the petitioner was unable to understand the proceedings or help in his own defense.

Trial counsel testified that the petitioner's brother was very helpful in his investigation and preparation of the case, arranging for the petitioner's potential witnesses, including Marquis Grayson and Lorez Murray, or "Gizmo," to meet with counsel. However, although Grayson volunteered to "say whatever [counsel] want[ed] [him] to say" in the petitioner's defense, each of the potential witnesses told counsel that he had not seen the actual shooting and did not know who was responsible for the victim's death. Counsel, therefore, saw no point in calling them as witnesses. Counsel stated that he called Jarvis Brown as a witness at the transfer hearing but that he evaded every question and was a "disaster," so he did not call him at trial.

Counsel testified that he saw no need to hire an investigator because all the witnesses were readily accessible to him, either through personal interviews arranged by the petitioner's

brother or through the statements they had given to the police. He also saw no reason to file a motion in limine to exclude gang references. Part of his defense strategy was to attempt to discredit one of the State's eyewitnesses by showing his membership in a gang. Furthermore, he did not remember the petitioner's ever having been identified at trial as a gang member. Counsel said he did not think the typical lay juror, unfamiliar with the criminal justice system, would automatically associate the petitioner's comment about "his folks" with membership in a gang. As for the admission of Trent Covington's statement to police, counsel testified that although he initially objected to it and perhaps, in hindsight, should have fought harder to keep the actual statement out of evidence, he did not want to "make a bigger deal out of it than it was" because Covington testified at trial that the statement was inaccurate and the trial court issued a limiting instruction to the jury regarding its use.

Trial counsel testified that their defense theory was that Cory Esmon, and not the petitioner, shot the victim. To that end, he not only vigorously cross-examined Esmon, but also called as a witness Tonya Thomas, who testified that Esmon, covered in blood and carrying the murder weapon, came running into the house after the shooting saying that he had to "pull the bullet" because it had his fingerprints on it. Counsel said that the petitioner maintained from the beginning that he was not the shooter but, for over a year prior to trial, insisted that he did not know who the actual shooter was. The petitioner changed his story shortly before trial, saying that he had seen Esmon shoot the victim. Because the petitioner had never before identified Esmon as the shooter, including during hours of police interrogation, counsel advised him that the prosecutor would be "a formidable opponent" to him if he took the stand in his own defense to testify that Esmon was the shooter. Counsel said that both he and the trial court took great care during the colloquy to ensure that the petitioner understood his rights with respect to testifying and that it was his own decision not to take the stand.

Trial counsel testified that he did not think it was a first degree murder case and believed that there was evidence to mitigate against its being a premeditated killing but that the petitioner was adamant that he did not want him to pursue that argument, despite counsel's best advice to the contrary. Counsel explained the post-conviction process to the petitioner, read the affidavit to him, and advised him to think about it and sign it if he wished to do so. According to counsel, the petitioner protested that he would never file an ineffective assistance of counsel claim against him and willingly signed the affidavit.

The petitioner's older brother, twenty-six-year-old Phillip Williams, testified that he offered his assistance to counsel and brought witnesses to him to be interviewed. Counsel did not, however, ever ask him to go into the community to knock on doors in an attempt to locate other witnesses, and counsel never discussed hiring a private investigator to help with

-4-

the case.

Marquis Grayson testified that he told trial counsel that he saw Cory Esmon shoot the victim. He said he expected to be called as a witness at trial, but counsel told him his testimony was unnecessary. Grayson adamantly denied having ever told counsel that he did not witness the shooting and claimed that counsel must have gotten him confused with someone else.

Trial counsel, recalled as a witness for the State, reiterated that Grayson never told him that he had seen Esmon shoot the victim but instead offered to say whatever counsel wanted him to say in the petitioner's defense.

On May 9, 2011, the post-conviction court entered an order denying the petition. Accrediting the testimony of trial counsel over that of the petitioner, and finding Grayson's testimony not to be credible, the court concluded that the petitioner failed to meet his burden of showing that counsel was in any way deficient in his performance, or that he was prejudiced as a result of counsel's alleged deficiencies.

## ANALYSIS

### I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### II. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S.

668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The petitioner argues that trial counsel was deficient for not filing a motion in limine to exclude any reference to his possible gang affiliation, for failing to object to the introduction of Trent Covington's statement, for failing to adequately investigate the case, for failing to instruct the petitioner of the consequences of a first degree murder conviction, for failing to argue against premeditation to the jury, and for failing to call essential witnesses.

The record, however, fully supports the findings and conclusions of the post-conviction court that the petitioner failed to show that he received ineffective assistance of counsel. As the post-conviction court noted, many of counsel's decisions, such as whether to call certain witnesses or to object to the introduction of evidence, were matters of sound trial strategy that were based on counsel's experience and preparation for the case. See Strickland, 466 U.S. at 689; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In addition, counsel's testimony, which was specifically accredited by the post-conviction court, established that counsel met with the petitioner on a number of occasions, took great care to explain to the petitioner the court proceedings, the evidence against him, his rights to testify, the consequences of a murder conviction, and the possible defense theories he believed they might advance. Trial counsel's testimony, as well as the affidavit, further establishes that

counsel ultimately proceeded with the identity defense that the petitioner maintained from the beginning and which he instructed counsel to pursue. We conclude, therefore, that the petitioner has not shown that counsel was deficient in his representation or that he suffered any deficiency as a result.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE