# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 10, 2007 Session

## MARLON FITZGERALD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-27659     Paula Skahan, Judge**

---

**No. W2006-01603-CCA-R3-PC  - Filed October 19, 2007**

---

The Appellant, Marlon Fitzgerald, appeals the denial of his petition for post-conviction relief by the Shelby County Criminal Court.  Fitzgerald was convicted by a jury of first degree premeditated murder, felony murder, and theft of property.  On direct appeal, this court affirmed the convictions and held that there was sufficient evidence to support the convictions and that the trial court's failure to charge the jury with lesser-included offenses was harmless error.  Fitzgerald then filed a petition for post-conviction relief, alleging the ineffective assistance of counsel, which the post-conviction court denied following an evidentiary hearing.  After a review of the entire record on appeal and the arguments of the parties, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Ryan B. Feeney, Memphis, Tennessee, for the Appellant, Marlon Fitzgerald.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Anita Spinetta, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

On October 11, 2001, the Appellant was convicted by a Shelby County jury for the murder of Tina Long.  Specifically, the jury convicted the Appellant of first degree premeditated murder, first degree felony murder, and theft of property valued at over $1,000 but less than $10,000.  The trial court merged the felony murder and premeditated murder convictions, resulting in a single judgment for first degree murder.  The Appellant was subsequently sentenced to life imprisonment for first degree murder and to four years for the theft conviction.

The underlying facts of the trial, as established on direct appeal, in relevant part, are as follows:

Nichole House, a friend of the victim, testified that on August 1, 2000, she left for work at 6:30 in the morning and saw the victim talking on the telephone. She said the victim asked the [Appellant] to return her car. She said she and the victim noticed that the victim's car keys and car, a white Hyundai Accent, were missing the day after she held a party at her apartment. She said the [Appellant] called her apartment to tell the victim he had taken the car. She said the victim did not go to work until the evening, and the [Appellant] said he would take the victim to work. She said the victim told the [Appellant] she needed him to return her car so she could get her baby some milk. She said the victim threatened to call the police if he did not return her car.

House testified she returned to her apartment around 10:30 a.m. She said the victim did not answer the door. She said she entered her apartment through the kitchen and saw that it was "torn up" and saw "stuff thrown everywhere" in the living room. She said she found the victim lying on the living room floor and left to get help.

. . . .

On cross-examination, House testified the victim and [the Appellant] dated for approximately one and a-half years and spent nights together at her apartment. She said that, on the day following her party, the [Appellant] phoned her apartment approximately twenty times to speak to the victim. She said she spoke with the [Appellant] to demand he return her VCR that he admitted taking from her apartment. She said the victim called the police to report her car stolen.

. . . .

[Cedric] Crump testified the [Appellant] phoned the victim from his apartment on the day of the victim's death. He said he overheard the [Appellant] telling the victim he would return her car. He stated that the victim called his home on the morning of the victim's death and asked to speak to the [Appellant]. He said he spoke to the victim while the [Appellant] left his apartment to return the victim's car. He said the victim told him she was tired of the [Appellant] running off with her car. He stated he was on the telephone with the victim when the [Appellant] entered her apartment.

Crump testified the [Appellant] returned, approximately thirty to forty minutes later, after his meeting with the victim. He said that the [Appellant] told him that "some ni**er was over there." He said he told the [Appellant] that he was on the telephone with the victim when the [Appellant] walked into the victim's apartment and did not

think there was anyone with the victim. He said the [Appellant] told him he owned the car with the victim.

    . . . .

Crump testified he called law enforcement to report the [Appellant] as a possible suspect and later helped the police in locating the [Appellant]. He said that the [Appellant] seemed happy prior to his meeting with the victim and did not seem to be under the influence of drugs. He stated the [Appellant] drank beer but never used drugs in his presence. Crump admitted that he had been convicted for theft of property in 1994.

    . . . .

Officer Bryant Brooks testified he responded to a call on Jefferson and Danny Thomas around one or two o'clock in the morning on August 2, 2000. He said he found the victim's white Hyundai Accent at the apartment building. He said the [Appellant] was apprehended as he entered the driver side of the Hyundai. He said the [Appellant] stated the car and house keys, in his possession, belonged to the victim. He said the [Appellant] was in his custody for approximately thirty minutes and did not appear to be under the influence of drugs or alcohol.

    . . . .

Officer Paul Wright, Jr. testified that he interviewed the [Appellant] about the victim's death. He said the [Appellant] voluntarily offered the following statements regarding his knowledge of the victim's death. On July 29, 2000, around 1:30 or 2:30 in the morning, the [Appellant] went to the victim's home. On the way, he met a man named DeMarcus, who questioned him about his relationship with the victim. He then confronted the victim about DeMarcus and they argued. The [Appellant] left the victim's house at 5:00 a.m. in the victim's car. In the early morning hours of August 1, 2000, the victim called the [Appellant] and asked him to return her car. The [Appellant] then went to the victim's apartment and found DeMarcus sitting on her couch. The [Appellant] was upset and left the victim's apartment with his clothes and the victim's car.

Officer Wright testified the [Appellant] was given a break after the first interview and was then given a second interview. He said the [Appellant] "broke down" and asked for a minister before giving another interview. Officer Wright read the following excerpt from the [Appellant]'s statement into the record[:]

["]We was supposed to be talking like she wanted to. She told me she had nothing to say to me and probably would never – say anything else to me. I told her that if

I couldn't be with her, I didn't want to be with any – with nobody else.  She told – she said, What you mean by that?  I told her that I would kill myself.  She said, Stop playing and be for real.  And she walked to the back.  When she came back in the living room, I was trying to choke myself with the cable cord, and she ran over there to me.  Next thing I remember, she wasn't moving.  I got scared and grabbed my clothes.  I got the TV's to pawn them so - excuse me.  I got the TV's to pawn them so I could try to get a bus ticket to go out of town, and I left.["]

        . . . .


The [Appellant] testified to his recollection of the events of July 28, 2000.  On this night, he and the victim attended a party and spent the night at Nichole House's apartment.  He left the party for several hours and consumed cocaine.  He spent several hours arguing with the victim before leaving House's apartment at 3:30 a.m. to do more drugs.  He went to Cedric Crump's house at 9:30 a.m.  Crump paid him with crack cocaine for driving him around town.  He got high for two days and slept very little.  He made many phone calls to the victim from Crump's apartment, and they would argue.  He chose to stay away from the victim because they were arguing.

The [Appellant] testified to his recollection of the events on Tuesday morning before the victim's death.  He smoked a rock of cocaine before visiting the victim.  Upon entering House's apartment, the victim began shouting at him.  He told the victim that he did not want to be with anyone else if he could not be with her.  After arguing with the victim in the middle of the living room floor, he tried to choke himself with a cable cord by wrapping the cord around his neck.  The victim tried to take the cord away from him.  He doesn't remember anything after grabbing the victim.  He saw the victim lying on the floor and didn't know what to do.  He gathered his clothes and a twenty-five-inch television before leaving.  The [Appellant] testified he did not wrap a cord around the victim's neck.  He said he dumped the television in a gas station's garbage can before returning to Crump's apartment.  He denied asking Crump if he wanted to buy a television.

On cross-examination, the [Appellant] testified that he had not been truthful concerning some of his earlier statements to the police.  He said he smoked approximately twenty-two rocks of crack cocaine and had not slept for days prior to the victim's death.  He said he did not remember what happened immediately prior to seeing the victim lying on the floor.  He said he did not admit to police that he is a drug user.  He said he did not take the victim's money pouch from her body.  He said he did not call 911 and did not seek help for the victim.  He said he had never done anything like this before but said he was convicted of assault on April 28, 1999.  The jury convicted the [Appellant] upon the foregoing evidence.

*State v. Marlon Marktavias Fitzgerald*, No. W2001-03096-CCA-R3-CD (Tenn. Crim. App. at Jackson, Feb. 7, 2003), *perm. to appeal denied*, (Tenn. July 7, 2003).

On direct appeal to this court, the Appellant challenged the sufficiency of the evidence supporting the murder convictions and further argued that the trial court erred by not charging the jury regarding second degree murder and voluntary manslaughter as lesser-included offenses of felony murder. *Id*. This court, in affirming the judgment of the trial court, concluded that there was sufficient evidence to support the convictions and that the trial court's failure to charge the jury regarding the lesser-included offenses was harmless error. *Id*.

The Appellant, proceeding *pro se*, filed a petition for post-conviction relief, alleging ineffective assistance of counsel. The Appellant was found indigent and was appointed counsel, who then filed an amended petition for post-conviction relief. An evidentiary hearing was held in the post-conviction court on February 23, 2006, during which the post-conviction court heard the testimony of the Appellant and trial counsel. On June 19, 2006, the post-conviction court entered an order denying the Appellant post-conviction relief. The Appellant timely appealed.

**Analysis**

On appeal, the Appellant argues that trial counsel was ineffective in several respects: (a) by failing to object to certain hearsay and opinion testimony of witnesses for the State at trial; (b) by failing to raise his warrantless arrest as a basis for suppressing the Appellant's admissions to police; and (c) by failing to request that the trial court charge the jury with lesser-included offenses of first degree murder. The Appellant further argues that the trial court committed plain error in neglecting to charge all of the lesser-included offenses of first degree murder and felony murder. Additionally, he asserts that the post-conviction court erred in its analysis of his claims of ineffective assistance of counsel under *Strickland v. Washington*.

In order to prevail on a post-conviction petition, the petitioner must establish that his conviction or sentence is void or voidable due to the abridgement of a constitutional right. T.C.A. § 40-30-103 (2003); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). In a post-conviction proceeding, the burden is on the petitioner to prove his allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2003). Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992).

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee a criminally accused the right to representation by counsel. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Both the United States Supreme Court and our supreme court have recognized that the right to such representation encompasses the right to "reasonably effective" assistance, that is representation within the range of competence demanded of attorneys in criminal cases. *Id*. To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the

defense. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994); *Butler v. State*, 789 S.W.2d 898, 899 (Tenn. 1990)).

To prove a deficiency in representation, the petitioner must show that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms. *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). To establish that a deficiency resulted in prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 370 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068)). This court has held:

> Where a claim of incompetency of counsel is alleged, this Court will not reverse the finding of the trial judge dismissing such petition if the action of trial counsel was based upon legitimate trial tactics and strategy. *State v. Martin*, 627 S.W.2d 139 (Tenn. Cr. App. 1981). However, if the record shows the action of trial counsel, in the circumstances shown, has no rational or logical basis, then the legitimacy of the tactics employed must be scrutinized under the requirement of *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975).

*State v. Buford*, 666 S.W.2d 473, 475 (Tenn. Crim. App. 1983). The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Burns*, 6 S.W.3d at 461. A trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, conclusions of law are reviewed under a purely *de novo* standard, with no presumption of correctness. *Id*. at 458.

## I. Ineffective Assistance of Counsel

### a. Failure to Object to Hearsay or Opinion Testimony of Trial Witnesses

The Appellant argues that trial counsel's failure to object to the testimony of the State's witnesses at various times during the trial proceedings rendered his assistance ineffective. The Appellant contends that these omissions by trial counsel resulted in the trial court's allowance of inadmissible hearsay testimony by these witnesses, as well as inadmissible testimony related to the lay witnesses' personal opinions concerning the guilt or innocence of the Appellant.

As a threshold matter, we note that the Appellant did not introduce the transcript of evidence from the trial proceedings into evidence at the post-conviction hearing. However, the record reflects that trial counsel was questioned at length regarding examples of purportedly objectionable testimony at the post-conviction hearing. The following exchange took place between trial counsel

and the Appellant's post-conviction counsel regarding certain hearsay testimony of the State's witness, Cedric Crump, involving a telephone conversation that Crump had with the victim on the day of her death:

> Q. Page 105, line 3, starting with question: "Okay, how do you know [the Appellant] walked into the apartment?" Answer: "Because she said Cedric – there he is right there, thank you, bye, I'll call you back. That's what she said."
> Do you agree with me that that is hearsay testimony?
>
> A. Yes, sir.
>
> Q. Do you agree with me that it's particular [sic] harmful testimony given that it establishes the identity of [the Appellant] as the person when she's talking on the phone there?
>
> A. I don't know.
>
> Q. Okay. Given that we – a moment ago we talked about statements which weren't objected to and one of the – one of the reasons you believe or you might have thought it wasn't going to be harmful is because you presumed that his – his actual (inaudible) at this location would be established.
> But it seems to me that there are a number of these points at which that location is established but they're done so through hearsay, is that fair?
>
> A. May well be.

The Appellant directed further questioning to trial counsel regarding his failure to object to similar testimony by another State witness, Sheila Avant. Upon examination by the State, trial counsel indicated that he did not object in these instances because he believed that the Appellant's own statement to police, as well as the Appellant's later testimony at trial, would establish his presence at the victim's residence on the day of her death. Thus, he believed that the hearsay testimony would not provide the jury with any new information.

Regarding objectionable opinion testimony admitted at trial, particularly that of Avant, the following line of questioning was directed at trial counsel:

> Q. Alright. Next instance at page 1 and 52 – I'm sorry. Okay, page 155 of the transcript and this is State witness Sheila Avant who was one of the persons who witnessed, was around when [the Appellant] came back to the residence the next day and she described what she saw his demeanor [sic] and things of that nature.
> What I want to ask you about is as far as 155, it's beginning at line 15 continuing, the witness says "He came back in and he had tears in his eyes, and he knocked on the door. Cedric opened the door, and when he came in he said man, that

ni\*\*er killed her. They said that my girl – that that was my girl that got killed. And Cedric asked him how did she get killed, and he said that somebody choked her with a cable cord."

Question: "Did at any point in time [the Appellant] stop crying?["] Answer: ["]Yes. Cedric said man, do you want a beer to calm your nerves? And he instantly stopped crying. He just the whole [indiscernible] off.["] Question: ["]Did you have any opinion about whether or not he was truly upset or truly crying after seeing him instantly stop crying when offered a beer?["] Answer: ["]Yeah, I did. I felt like the tears were fake because as soon as he offered him a beer he stopped crying. There were no more tears."

Would you agree with me that this testimony about – about his opinion about the truthfulness or the veracity of those tears was an improper opinion for a lay witness to give?

A.      I don't know.

Q.      Okay. Is the sincerity of somebody's actions truly something that can be determined through five senses?

A.      I think the witness can testify to what he perceives.

Q.      Isn't that perception though limited though [sic] what the witness can see or touch or smell or hear?

A.      Sure.

Q.      And none of that involves the actual sincerity, he could say there were tears or no tears, but not that I think the guy was lying, right?

A.      (No response.)

Q.      Do you agree with me that the tone of the question and the answer was such that that's exactly what the witness did testify to?

A.      Yeah.

Q.      Is there any reason you didn't object?

A.      I can't give you one.

The Appellant also questioned trial counsel regarding his failure to object to the opinion testimony of Crump, who had described the Appellant's reaction after he had discovered the death of the victim

and who testified that, at that point, he "really started believing that . . . [the Appellant] had did it [sic]."

The post-conviction court found no merit to either of these issues pursued by the Appellant. The court examined the proof from the post-conviction hearing and accredited the testimony of trial counsel regarding his rationale for not making these objections, concluding that the failure to object to such testimony did not necessarily fall below the objective standard of reasonableness under prevailing professional norms. Additionally, the post-conviction court concluded that the Appellant had failed to establish prejudice from the failure of trial counsel to object to this testimony. After a thorough review of the record on appeal, we conclude that the post-conviction court did not err in its analysis of this issue. Accordingly, the Appellant's position is without merit.

### b. Failure to Raise Fourth Amendment Grounds as Basis for Suppression of the Appellant's Admissions to Police

The Appellant asserts that trial counsel rendered ineffective assistance by failing to challenge, on Fourth Amendment grounds, the admissibility of his admissions to police through his "fail[ure] to raise this argument at the pre-trial motion hearing, or in his motion for new trial, and in failing to preserve this issue for direct appeal." He contends that "[t]he arrest of the petitioner was effectuated by Memphis [p]olice officers without any information save what they had learned from [informant] Crump, and such information was never verified by the police prior to the arrest of the petitioner." The Appellant asserts that the arrest was made without probable cause and that the statements taken after his arrest were fruits of the poisonous tree and, therefore, inadmissible at trial.

The factual allegations submitted by the Appellant to bolster his position are not supported by the record before this court. While trial counsel admitted that the Appellant was arrested soon after the police received a tip from Crump, the record does not support a finding that the information received by the police was unreliable or unverified. At the post-conviction hearing, it was established that, although trial counsel included the Fourth Amendment as a basis for suppressing the Appellant's admissions to police after his arrest in the motion to suppress, at the suppression hearing itself, trial counsel chose to pursue Fifth and Sixth Amendment grounds for suppression, specifically the theory that the Appellant's statements were involuntary due to his alleged intoxication on crack cocaine. Trial counsel responded to questioning at the post-conviction hearing as follows:

> Q.    Okay. Would you agree with me that given the questionable proof that we have on the medical issues and the drug addiction that the Fourth Amendment ground might have been significantly stronger than the Fifth and Sixth Amendment ground?
>
> A.    I don't know.
>
> Q.    Okay.

A.	I don't know.

Q.	Sitting, just talking with me as a person trained in the law what would be your defense, I guess, if I were to offer to you that [the Appellant] was arrested without probable cause and you were for the State what would you say in response?

A.	If I were for the State?

Q.	Yes.

A.	They were acting on a tip.

Q.	Okay. But does every tip constitute probable cause for arrest?

A.	No.

. . . .

Q.	But what circumstances in your mind – now, again, you're leaning over and putting on the hat of the State, what circumstances would have justified the arrest?

A.	Well, I guess they would have had to have gotten a – well, they would have had to check to see whether the – the Crime Stopper's Tip was valid.

Q.	Do you know if they checked?

A.	I don't know.

Q.	Okay. Anything else?

A.	And I guess they would have had to check the information.

Q.	Okay. But you don't know if they checked it?

A.	No.

Upon examination by the State on this issue, trial counsel testified as follows:

Q.	In the discovery that you read you got the arrest report and several other police reports.

A.	Uh-huh.

-10-

Q. And in that discovery those reports indicated that witnesses had seen the [Appellant] going to and from the victim's apartment, had seen the [Appellant] drive the victim's car, had told the police that the car was stolen, that further that the [Appellant] had made statements to the complaining witness, Cedric Crump, that had used cable cord to choke the victim, and that the news [media] was wrong in reporting it was a phone cord, that it was a cable cord which, in fact, was the item used to choke the victim as reported in the Medical Examiner's Report?

All of that was in the –

A. In the discovery, yes.

Q. – discovery?

A. That's correct.

Q. And when the [Appellant] was arrested he had placed the keys in the stolen, the victim's stolen vehicle?

A. I believe so.

Q. And the officers had all this information at the time that they made the arrest?

A. I believe they did.

Q. They had spoken with witnesses that also then later testified at trial, including Sheila Avant and Cedric Crump that placed the [Appellant] as the person who had killed [the victim], and also placed him as having stolen her car, correct?

A. That's correct.

Q. So that would be ample basis, ample probable cause for the police to arrest this [Appellant], correct?

A. I – I believe it would be. My focus was on – I wasn't really focusing on that, but that's why I can't answer a hundred percent.

Q. And you didn't focus on it because when you read it you did not see any concern, any Fourth Amendment concern. Your greater concern was based on the level of intoxication the [Appellant] was claiming to be – to have at – and any possible coercion that took place in obtaining the statement?

A. That's correct.

Q.     And reviewing it now if you'd like to have an opportunity to review the discovery again you can, but reviewing it now in your opinion you don't feel that he has a valid basis to challenge the Fourth Amendment grounds of the arrest that would justify suppression of the statement?

A.     Not from everything that I knew about the case at the time.

In its order denying post-conviction relief, the post-conviction court accredited trial counsel's testimony that "his strategy in attempting to suppress the statement . . . was to attack the statement on Fifth and Sixth Amendment grounds" based upon the theory that the statement was involuntary due to the alleged intoxication of the Appellant on crack cocaine at the time the statement was given. The post-conviction court found that trial counsel's decision was a reasonable exercise of strategy and concluded that the Appellant's argument was without merit.

The Appellant's failure to introduce, in the post-conviction court, the transcripts from the trial proceedings and the suppression hearing constrains our review of this issue to the appellate record presently before us, which consists of one technical record, one volume of transcript from the post-conviction hearing, and a single, unrelated exhibit admitted into evidence at the hearing. Furthermore, the Appellant did not call the police officers involved in his arrest or interrogation as witnesses at the post-conviction hearing. Thus, the record fails to establish what specific "probable cause" information the police possessed at the time of the Appellant's arrest. We hold that trial counsel's failure to focus on the Fourth Amendment as a basis for suppression of the Appellant's admissions to police did not constitute ineffective assistance of counsel. Therefore, as the Appellant failed to carry his burden on this issue, it is without merit.

### c. Failure to Request Jury Instruction on Lesser-Included Offenses

The Appellant also asserts that trial counsel provided ineffective assistance by failing to request that the jury be charged with the elements of reckless homicide and criminally negligent homicide as lesser-included offenses of both felony and premeditated first degree murder.

Certain aspects of this issue were addressed in the decision on direct appeal, when this court held that the trial court's failure to charge the jury with the elements of lesser-included offenses of felony murder was harmless error beyond a reasonable doubt. Specifically, this court concluded that "the trial court's failure to instruct the jury on the lesser-included offenses of felony murder did not alter the jury's intentions of convicting the defendant of first degree murder." *Marlon Marktavias Fitzgerald*, No. W2001-03096-CCA-R3-CD. In the present case, the Appellant has couched this issue in terms of ineffective assistance of counsel. Because ineffective assistance of counsel was not presented or previously determined on direct appeal, this claim is not barred as having been waived or previously determined. *See Diallo J. Lauderdale v. State*, No. W2005-02135-CCA-R3-PC (Tenn. Crim. App. at Jackson, Nov. 7, 2006) (citing *Perry Saleem Lee v. State*, No. M2001-01141-CCA-R3-PC (Tenn. Crim. App. at Nashville, Dec. 13, 2001)); *see also Kendricks v. State*, 13 S.W.3d 401 (Tenn. Crim. App. 1999). However, upon consideration of both the findings of the post-conviction

court and our harmless error analysis of this issue on direct appeal, we conclude that the Appellant failed to carry his burden to establish that trial counsel's failure to request these instructions amounted to ineffective assistance or that he suffered prejudice as a result. Accordingly, this issue is without merit.

Regarding the issue of trial counsel's failure to request jury instructions for all of the lesser-included offenses of first degree premeditated murder, we conclude that the Appellant's argument is similarly unavailing. At the post-conviction hearing, trial counsel stated that he requested that the jury be charged with the lesser-included offenses of second degree murder and voluntary manslaughter. Nothing appears in the record before us to contradict this statement of trial counsel, and the Appellant does not dispute that these requests were made. In *State v. Allen*, our supreme court stated:

> When a lesser-included offense instruction is improperly omitted, we conclude that the harmless error inquiry is the same as for other constitutional errors: whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial. In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury. A reviewing court may find the error harmless because the jury, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, necessarily rejected all other lesser-included offenses. Harmless error is not limited, however, to such cases.

69 S.W.3d 181, 191 (Tenn. 2002).

After finding that trial counsel had requested the jury charge of the lesser offenses of second degree murder and voluntary manslaughter, with those charges being given, the post-conviction court rejected this argument, concluding that trial counsel's failure to request jury instructions for reckless homicide or criminally negligent homicide was a reasonable exercise of professional judgment at the time of trial. We agree.

Additionally, the proof at trial established that although a cord was wrapped around the victim's neck, the victim died as a result of "smothering," which was evidenced by extensive damage to the mouth. The medical examiner opined that "smothering" the victim would have required "five to six minutes" to produce death. It is inconceivable that a jury would have convicted the Appellant of a reckless or negligent homicide based upon the act of suffocation under these facts, particularly in light of the jury's apparent rejection of the charged offenses of second degree murder and voluntary manslaughter. Furthermore, the Appellant has failed to demonstrate any proof to this court that his mental state or culpability was in any way lessened so that either theory might have applied to his murder of the victim. Reckless homicide is the reckless killing of another. T.C.A. § 39-13-215(a) (2003). Criminally negligent homicide is criminally negligent conduct which results in death. T.C.A. § 39-13-212 (2003). Therefore, we conclude that the Appellant further failed to establish that

trial counsel's failure to request these instructions resulted in prejudice. Accordingly, this issue is without merit.

## II. Failure of the Trial Court to Charge the Jury with All Lesser-Included Offenses

In addition to his ineffective assistance of counsel argument, the Appellant submits that the trial court committed plain error by refusing to charge the jury with all of the lesser-included offenses of first degree premeditated murder and felony murder. Again, as to the trial court's jury charge regarding felony murder, this issue was addressed fully on direct appeal. Issues which have been previously determined may not be raised through a post-conviction challenge. *See* T.C.A. § 40-30-106(h) (2003). To the extent that the Appellant alleges plain error by the trial court in failing to charge all lesser-included offenses of first degree murder, this argument is waived for failure to raise it on direct appeal. *See* T.C.A. § 40-30-106(g). Moreover, plain error analysis is not available in an appeal of a post-conviction denial. *State v. Wade P. Tucker*, No. M2004-02792-CCA-R3-PC (Tenn. Crim. App. at Nashville, Nov. 22, 2005) (citing *State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000)). Therefore, this issue is without merit.

## III. *Strickland* Analysis by the Post-Conviction Court

Finally, the Appellant contends that the trial court erred by applying the two-pronged approach of *Strickland v. Washington*, 466 U.S. at 687, 104 S. Ct. at 2052 to his claims of ineffective assistance of counsel, arguing that the trial court should have instead applied the approach set forth in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039 (1984). The Appellant argues that application of *Cronic* to this case was proper, because the various failings of trial counsel "led directly to the elimination of the adversary system" and that the verdict from the trial below is "wholly unreliable." Conversely, the State submits that the post-conviction court properly reviewed trial counsel's actions under *Strickland*. The State argues that *Cronic* is inapplicable to this case, because the record does not support a presumption of prejudice as a result of trial counsel's representation of the Appellant.

Our supreme court discussed both the *Strickland* and *Cronic* decisions in *Wallace v. State*, stating:

> In determining whether a defendant has been denied the constitutional right to effective counsel, courts apply a two-pronged test. *Strickland v. Washington*, 466 U.S. 668, 688, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *see also State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

> First, a defendant must prove that counsel was ineffective by showing errors made by counsel that caused the assistance of counsel to fall below prevailing professional norms. *Strickland*, 466 U.S. at 687. In making this assessment, however, courts must be deferential to the tactical decisions of counsel and must not

-14-

base assessments on a lawyer's competence from the clear perspective of hindsight. *Id.* at 689.

Second, upon establishing that counsel was deficient, the petitioner must establish a reasonable probability that the outcome of the trial would have been different but for the deficiencies of counsel. *Strickland*, 466 U.S. at 687, 694. Although this second prong of the *Strickland* analysis is commonly referred to as "actual prejudice," *see, e.g., Overton v. State*, 874 S.W.2d 6, 11 (Tenn. 1994), there is a small category of cases in which actual prejudice need not be shown. *See United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). In *Cronic*, for example, which was decided on the same day as *Strickland*, the United States Supreme Court stated that there are situations where counsel's performance is so deficient that it becomes presumptively prejudicial. *Cronic*, 466 U.S. at 658. In comparing this level of ineffective counsel to the complete denial of counsel, the Court concluded that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," the process becomes "presumptively unreliable" and proof of actual prejudice is not required. *Id*. at 659.

121 S.W.3d 652, 657 (Tenn. 2003).

We find the Appellant's argument to be misplaced. *Cronic* permits a presumption of prejudice to a defendant when it can be shown that counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Id.* at 657. As we have already indicated our agreement with the post-conviction court's conclusion that Appellant failed to satisfy the first prong of the *Strickland* test, specifically "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms," we agree with the State's position that an examination of trial counsel's representation under *Cronic* is wholly inappropriate in this case. Accordingly, the Appellant's argument is without merit.

**CONCLUSION**

Based upon the foregoing, the judgment of the Shelby County Criminal Court is affirmed.

_____
DAVID G. HAYES, JUDGE

-15-