# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 4, 2010

## JOE MARVIN ELLISON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-09-257      Roy B. Morgan, Jr., Judge**

**No. W2009-02380-CCA-R3-PC  - Filed June 18, 2010**

The petitioner, Joe Marvin Ellison, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing he received the ineffective assistance of counsel which caused him to enter unknowing and involuntary guilty pleas. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Joe Marvin Ellison.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The following account was taken from this court's opinion on the direct appeal of the petitioner's motion to withdraw his guilty pleas:

> On March 2, 2009, the [petitioner] was charged in a five-count indictment with attempted first degree murder, aggravated assault, especially aggravated robbery, especially aggravated kidnapping, and aggravated rape. The facts from the affidavit of complaint giving rise to the indictment established that the victim, Patricia Currie, was at her home watching

television the evening of July 23, 2008, around 9:45 p.m. when she heard a noise. The victim was startled to see the [petitioner], whom she knew as Joe Turner, standing in her living room. The [petitioner] initially asked for money, but she told him she had none. He put a dog chain around her neck and started strangling her, so she told him that she had money in her bedroom. The [petitioner] took the victim to her bedroom and began looking through her belongings. She gave him twenty-four dollars out of her purse. The [petitioner] threw her on the bed and started taking off her clothes. The [petitioner] "had a condom on and started strangling her till she pas[sed] out." The victim awoke later to find her pants at her ankles. The victim helped the police in developing a suspect, and the [petitioner] was included in a six-person photographic array that was shown to the victim. The victim positively identified the [petitioner] as her assailant.

On April 13, 2009, the [petitioner] and the State entered into a negotiated plea agreement whereby the attempted murder charge was dismissed, and the [petitioner] agreed to serve fifteen years at 60% for aggravated assault, twenty-five years at 45% for aggravated robbery, twenty-five years at 100% for aggravated kidnapping, and twenty-five years at 100% for rape. The State recommended that all the sentences run concurrently for an effective term of twenty-five years. After a plea hearing, the trial court accepted the negotiated plea agreement and entered judgment on April 16, 2009.

On April 28, 2009, a letter from the [petitioner] to the trial court was filed with the Madison County Circuit Court Clerk. In that letter, the [petitioner] told the court that he wanted to withdraw his guilty pleas because he felt he was coerced by his attorney into accepting the plea agreement, he did not fully understand or comprehend the agreement, and his attorney acted inappropriately and rendered ineffective assistance. The [petitioner] subsequently filed a formal *pro se* motion to withdraw his guilty pleas. In that motion, the [petitioner] argued that his pleas should be set aside because he was innocent of the charges and a manifest injustice would occur if the pleas were not withdrawn. He also asserted that the pleas were "a direct result of coercion" placed on him by his attorney.

At the hearing on the [petitioner]'s motion, the [petitioner] testified that when the trial court informed him at the plea hearing that his sentences for aggravated kidnapping and rape were "outside [his] range," he hesitated until his attorney "whispered in [his] ear . . . kind of coercing [him] to go ahead on

-2-

and sign it." He claimed that his attorney did not inform him of the range of punishment applicable for each of his offenses. He said that his attorney assured him that "[i]t[] [was] going to be all right," and he assumed that being an attorney, "she kn[ew] what she[] [was] talking about."

State v. Joe Marvin Ellison, No. W2009-01134-CCA-R3-CD, 2010 WL 962936, at *1-2 (Tenn. Crim. App. Mar. 16, 2010).

On September 11, 2009, while the direct appeal on the petitioner's motion to withdraw his guilty pleas was pending, the petitioner filed a *pro se* petition for post-conviction relief. The State filed a response and motion to dismiss on September 17, 2009, arguing that the issues raised in the petition had been determined in the hearing on the motion to withdraw his guilty pleas. Following the appointment of counsel, the petitioner filed an amended petition for post-conviction relief on October 19, 2009. That same day, the State filed another response and motion to dismiss. The State's motions to dismiss were denied, and a post-conviction evidentiary hearing was held on November 9, 2009.

At the hearing, the petitioner admitted that when he entered his guilty pleas he testified that he was satisfied with his trial counsel's performance, but he now felt differently. He explained that he only pled guilty because he was frustrated that he had just gotten out of jail on another sentence and was under duress when he decided that he "just basically want[ed] to go ahead on and get it over with." He admitted that he wrote a letter to counsel asking her to negotiate a deal with a sentence of twenty to thirty years but only because he thought he was facing a life sentence if he went to trial. His belief that he faced a life sentence came from "watching the *Law and Order* shows on TV and by word of mouth" and because counsel did not explain in detail the charges against him and the penalties he faced.

The petitioner asserted that counsel failed to obtain the results of any DNA tests conducted on a condom that was found behind the victim's house, and the results would have "reduced the rape charge or practically been dismissed." However, he acknowledged that he had sex with the victim and that DNA testing would have confirmed that it was his semen on the condom. The petitioner said that he gave counsel a list of witnesses, including his mother, two nieces, and a nephew, who could verify that he and the victim had a relationship, but counsel failed to interview his witnesses.

The petitioner stated that counsel failed to obtain a transcript from his preliminary hearing, which would have showed that the victim's testimony was inconsistent. However, the petitioner admitted that at the time he pled guilty, the fact he did not have the preliminary hearing transcript really did not affect him because he was at the hearing and knew what was

said.

The petitioner stated that he did not entirely understand his plea agreement and only averred to the trial court that he understood because counsel whispered in his ear, "'It's gonna be all right. You remember what we talked about. Everything's gonna be all right.'" The petitioner felt compelled to plead guilty because he did not think counsel would defend him appropriately based on the tone of their conversations and his knowledge of deals counsel had negotiated for other people he knew. The petitioner claimed that he was not guilty but admitted that he would lie to the judge and say he was guilty if he thought he could get a better deal.

Bernice Turner, the petitioner's mother, testified that she lived across the street from the victim and knew that the petitioner had been to the victim's house "plenty of times." She said that before the incident in this case, the victim called her house several times because she wanted to see the petitioner when he was released from prison. Turner said that no one from counsel's office ever interviewed her.

Maurice Reynolds, the petitioner's nephew who lived with Turner, testified that the victim called three or four times for the petitioner, and the petitioner went to her house on two occasions. Reynolds said that he was not interviewed by anyone from counsel's office. Reynolds stated that even though he had this important information all along, he was not going to volunteer it until he was subpoenaed.

Melissa Turner, the petitioner's niece, testified that she did not have personal knowledge of a relationship between the petitioner and the victim, but she was present at Bernice Turner's house one day when the victim called asking to speak with the petitioner. She said that she had seen the petitioner go to the victim's house. She stated that no one from counsel's office interviewed her but admitted that she did not take the initiative to tell anyone this important information.

The petitioner's trial counsel testified that she did not speak with the petitioner's mother about whether the petitioner and the victim had a sexual relationship because the petitioner said that the foundation for her knowledge was that "[the victim] called all the time," which was not firsthand knowledge of a sexual relationship between the two. Counsel stated that she made a note that she could talk to Bernice Turner and subpoena her phone records, but the petitioner decided he wanted a plea deal before she had the chance. Counsel said that she was not provided the names of the petitioner's niece and nephew as possible witnesses.

Counsel testified that she did not pursue the issue of DNA testing on the condom because the petitioner decided he wanted to plead, but she assumed that his DNA would have been found on the condom given his admission that he had sex with the victim. Her review of the physical evidence did not support the petitioner's claim of consensual sex, and when she questioned the petitioner about that, he said the victim's son had "beat her up." Counsel discovered, however, that the victim's son was incarcerated in the criminal justice center on the date of the incident.

Counsel testified that the preliminary hearing was in the process of being transcribed when the petitioner notified her that he wanted a plea, so she halted the transcription. Counsel said that she explained the petitioner's plea to him, and her review of his criminal history indicated that he actually did not plead outside the appropriate range.

Counsel summarized:

[The petitioner] was adamant in the beginning that he wanted a trial. I did everything I could to try to accommodate him concerning a trial. He contacted me and was adamant that he wanted to plea[d]. I did everything I could to negotiate the best deal that I could for him, and he seemed very pleased with it when he left court. It wasn't until several weeks later when I received a letter from him saying, "Oh, I've pled outside my range. I want 15 years," that I was even aware there was a problem.

In denying the petition, the court noted that there was a very thorough examination of the petitioner at the guilty plea hearing and that there was "no question[]" that he understood the pleas. The court noted that the petitioner raised no questions about counsel's representation. The court concluded that the petitioner entered his pleas freely and voluntarily and that "counsel did not fall below the standard required in representing [the petitioner]."

## ANALYSIS

The petitioner argues that he received the ineffective assistance of counsel, which caused him to enter unknowing and involuntary guilty pleas.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the

findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "In cases involving a guilty plea or plea of nolo contendere, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have

pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985); Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)).

When analyzing a guilty plea, we look to the federal standard announced in Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard set out in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242. Similarly, in Mackey, our supreme court required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. Pettus, 986 S.W.2d at 542.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. Pettus, 986 S.W.2d at 542; Blankenship, 858 S.W.2d at 904. Because the plea must represent a voluntary and intelligent choice among the alternatives available to the defendant, the trial court may look at a number of circumstantial factors in making this determination. Blankenship, 858 S.W.2d at 904. These factors include: (1) the defendant's relative intelligence; (2) his familiarity with criminal proceedings; (3) whether he was represented by competent counsel and had the opportunity to confer with counsel about alternatives; (4) the advice of counsel and the court about the charges against him and the penalty to be imposed; and (5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial. Id. at 904-05.

The petitioner alleges that counsel rendered deficient performance in that she failed to interview witnesses who would have testified that he and the victim had a prior romantic relationship, failed to obtain a transcript of the preliminary hearing, and unduly influenced and coerced him into pleading guilty. However, counsel's accredited testimony from the evidentiary hearing showed that the petitioner's mother's basis of knowledge was not sufficient to prove he and the victim had a prior sexual relationship. Even so, the reason counsel did not interview the petitioner's mother was because the petitioner decided that he no longer wanted to go to trial and wanted to plead guilty. Counsel testified that, likewise, she halted the transcription of the preliminary hearing when the petitioner decided to plead guilty. Counsel testified that she did not receive the names of the petitioner's niece and nephew as possible witnesses.

With regard to the knowing and voluntary nature of the petitioner's guilty pleas and the petitioner's corresponding claim that counsel coerced him into pleading guilty, the record supports the post-conviction court's finding that "nothing presented in the evidence suggests that [the petitioner] was in any way pressured or coerced into entering his guilty/best interest plea[s]." The evidence shows that the petitioner sent counsel a letter saying that he was trying to avoid a trial and asking her to negotiate a plea deal wherein he would serve between twenty and thirty years, and the offer he received was for twenty-five years. The perception that the petitioner faced a life sentence if he went to trial came from his watching "Law and Order" television shows and comments he heard by word of mouth, not from counsel. The transcript from the guilty plea colloquy shows that the petitioner, who was no stranger to criminal proceedings, was very thoroughly apprised of the specifics of his pleas and was satisfied with counsel's representation, and he is now simply wanting a better deal.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that trial counsel was ineffective in her representation or that the petitioner's guilty pleas were unknowing and involuntary. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE