
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 8, 2021

**MATTHEW SEALEY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-20-13  Donald H. Allen, Judge**

_____

**No. W2021-00129-CCA-R3-PC**

_____

The petitioner, Matthew Sealey, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel prior to and during his guilty plea hearing.  Upon our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Matthew Sealey.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

**I.     Guilty Plea Hearing**

On October 17, 2019, the petitioner pleaded guilty to second-degree murder and aggravated child abuse in connection with the death of his infant son, A.S.[1]  As part of the plea agreement, the petitioner agreed to be sentenced as a Range II offender and received

---

[1] It is the policy of this Court to refer to minor victims by initials only.

an effective sentence of thirty years in confinement. The facts underlying the plea, as explained by the State, were as follows:

[I]f this case were to proceed to trial the State would show that [the victim] was born on May 2nd, 2018. On July 7th, 2018, Erin Woolfork, the mother of [the victim], was residing at 1000 Highland Drive here in Madison County, Tennessee. Ms. Woolfork would testify that about ten days prior [to the victim's death, she took the victim] for a checkup [and] that at that time he was in good health and had no medical issues that were identified by the doctor. She would testify on July 7th she went to bed at approximately 10:30 p.m. At that time [the victim] was healthy and hadn't had any signs of any medical distress. She would testify that [the petitioner], the father of [the victim], agreed to stay up with [the victim] at that time.

Later the next day, Your Honor, July the 8th of 2018, Erin Woolfork woke up at approximately 4:30 a.m. and checked on [the victim]. She found that [the victim] was not breathing and was cold to the touch. She woke up [the petitioner] and they at that time called 9-1-1 and began CPR on [the victim].

Your Honor, Brandy Austin and Heather Swindle are both employed by the Medical Center EMT here in Madison County. They would both testify that they responded to the scene and that [the victim] was deceased at the time they responded and that rigor mortis was present indicating that [the victim] had been deceased for some time.

Your Honor, [the petitioner] advised the EMT workers that earlier in the night that [the victim] had rolled off an ottoman and hit his head on the bed and there was a small mark on his head from that fall. He stated that he picked [the victim] up at that time and that everything appeared fine. [The victim] was transported to Jackson Madison County Hospital and was pronounced dead at that time.

An autopsy was performed by Dr. Dearing with the Office of the Medical Examiner in Nashville, Tennessee. The autopsy revealed significant blunt trauma injury to the abdomen. There was a presence of bruising along [the victim's] back and there were several rib fractures. Your Honor, if I recall correctly ribs 2 through 7 were all fractured. There was a hemorrhage surrounding the right kidney.

Your Honor, the injury that resulted in [the victim's] death was he suffered a severe laceration to his liver that resulted in internal bleeding. Dr. Dearing would testify that the cause of death was blunt force trauma that caused that injury and the manner of death was homicide. Your Honor, Dr. Dearing would testify that these injuries are not consistent with the original story that [the petitioner] provided on possible causes of how [the victim] died specifically being falling off the ottoman. He would testify that falling off that distance would not result in this severe internal injuries.

Dr. Dearing in speaking with investigators about this case, he would testify that he developed a theory that these injuries most likely would have been caused by an individual wrapping both the hands around the baby's torso and violently squeezing the baby that that would cause the – that would explain the broken ribs on the back from the fingers and then the ribs would be broken from the thumbs and that would lead to the internal injuries being the lacerations of the liver.

Your Honor, after investigators spoke with Dr. Dearing and learning that that would be the most likely cause of these injuries, the most likely way these injuries would have occurred, they interviewed [the petitioner]. This was the third time he had been interviewed. During the previous interviews he had discussed again the baby falling off of the ottoman. He had also told investigators that both he and Erin had performed CPR on [the victim] when the[y] found [the victim].

Your Honor, I failed to mention that Dr. Dearing also reviewed the first two interviews on video. They were video taped of [the petitioner] and Erin Woolfork. In those interviews they showed investigators how they performed CPR and based on how they performed CPR for the investigators Dr. Dearing also said that that's not how the ribs were broken and that they would not be broken in that manner by the way they were performing CPR so they had to have been broken some other way.

Your Honor, during the third interview on February 4th, 2019, [the petitioner] gave investigators additional information on how the injuries to [the victim] could have possibly occurred. He then stated that not only did [the victim] fall off the ottoman that night but that while [the petitioner] was carrying [the victim] he had accidentally bumped into the wall at least once and possibly twice while carrying the [victim] and maybe that's how he suffered the injuries. After the investigators questioned him further and explained that that would not really explain the extent of his injuries

- 3 -

especially again the severe lacerations of the liver, at that time [the petitioner] did admit to picking [the victim] up with force and squeezing [the victim] with force and he actually demonstrated it for the officers, Your Honor, and this was again a video taped interview so the jury would be able to see the manner in which he picked the child up, but it was basically exactly how Dr. Dearing described how the injuries could have occurred with him picking [the victim] up with both hands and he stated that he did squeeze [the victim] with force and he stated that he bent over holding [the victim] squeezing him. Again, this would be consistent with how Dr. Dearing stated the injuries to [the victim] could have occurred.

During his plea colloquy, the petitioner informed the trial court that he understood his rights.[2] He further understood that, by pleading guilty to the charges, the petitioner would be waiving his right to a trial by jury, to confront witnesses against him, and to appeal. The petitioner testified he was satisfied with the representation of trial counsel. Finally, the petitioner affirmed he was not being forced to plead guilty, and no one had made promises to him in exchange for his guilty plea. The trial court accepted the plea agreement and found the petitioner guilty of second-degree murder and aggravated child abuse.

## II.     Post-Conviction Hearing

The petitioner filed a pro se petition for post-conviction relief, arguing, in part, trial counsel was ineffective for failing to tell the petitioner "what [he] should [have] done to have a better sentence." The post-conviction court appointed counsel, and an evidentiary hearing was held, during which the petitioner and trial counsel testified.

The petitioner testified that trial counsel was appointed to represent him following his arrest for the victim's murder. Although trial counsel was able to secure a thirty-year plea agreement with the State, the petitioner believed trial counsel should have done more to negotiate a lower sentence. Specifically, the petitioner argued trial counsel "should have helped [the petitioner] more deal with it instead of just giving [the petitioner] the same plea [offer] over and over." The petitioner talked to trial counsel about negotiating a better plea, but trial counsel failed to do so. On cross-examination, the petitioner agreed that trial counsel was able to negotiate a plea in which the State reduced the first- degree murder charge to second degree, sparing the petitioner a life sentence.

Trial counsel testified he was appointed to represent the petitioner on his first-degree murder and aggravated child abuse charges. At some point, the State extended the thirty-

---

[2] The petitioner, who has Usher Syndrome, testified through a sign language interpreter.

year plea offer. Trial counsel attempted to negotiate the charges down to reckless homicide and a lesser offense on the aggravated child abuse. However, the State refused to entertain a lower offer, and the petitioner was left with the option of accepting the thirty-year offer or proceeding to trial. On cross-examination, trial counsel testified the petitioner has Usher Syndrome, which causes hearing and vision problems. However, the petitioner was able to read trial counsel's lips when they met at the jail, and they also communicated via mail. Because the petitioner had admitted to squeezing the victim, if the case had gone to trial, the defense strategy would have been to argue that the petitioner did not intend to kill the victim.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

### *Analysis*

On appeal, the petitioner argues his guilty plea was the result of ineffective assistance of counsel. Specifically, the petitioner argues trial counsel failed to negotiate a better plea agreement. The State contends the post-conviction court properly denied the petition.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

A guilty plea must be knowingly, voluntarily, and intelligently entered in order to be valid. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010). The court must determine whether the guilty plea evidences a voluntary and informed decision to pursue a guilty plea in light of the alternative options available to the defendant. *Id.* In the context of a post-conviction challenge to a guilty plea, both prongs of the *Strickland* test must be met. *Garcia v. State*, 425 S.W.3d 248, 256 (Tenn. 2013). Thus, to successfully challenge his guilty plea, the petitioner must show counsel's performance was deficient, and he "must establish a reasonable probability that, but for the errors of his counsel, he would not have entered the plea." *Adkins v. State*, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *Garcia*, 425 at 257 (Tenn. 2013).

The petitioner argues trial counsel failed to negotiate a more favorable plea offer due to his "lack of attention to [the petitioner's] defense and his ignorance of the criminal

justice system." However, the petitioner merely submits this conjectural assertion without providing any argument regarding how trial counsel would have been able to effectuate a more favorable offer. The petitioner has offered no proof or argument as to how trial counsel failed to "pay attention" or as to the depth or lack thereof of trial counsel's knowledge of the criminal justice system. Likewise, the defendant offers no legal authority or citations to the record in support of his argument.

Furthermore, at the evidentiary hearing, trial counsel testified that he attempted to negotiate the murder charge to a reduced charge of reckless homicide and the aggravated child abuse charge reduced to a lesser offense. However, the State refused to waiver from its initial offer of thirty years. The petitioner cannot fault trial counsel for the State's resistance to further plea negotiations. The post-conviction court accredited trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. The petitioner is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE