IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2022

## MICHAEL WAYNE ROBINSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-20-103          Roy B. Morgan, Jr., Judge**

_____

### No. W2021-00886-CCA-R3-PC

_____

The Petitioner, Michael Wayne Robinson, appeals the denial of his petition for post-conviction relief from his convictions for reckless endangerment, aggravated assault, and unlawful possession of a weapon, arguing that the post-conviction court erred in finding that he received the effective assistance of trial counsel. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Michael Wayne Robinson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The Petitioner was convicted by a Madison County jury of three counts of aggravated assault, one count of reckless endangerment with a deadly weapon, and one count of unlawful possession of a firearm by a convicted felon, for which he received an effective sentence of eighteen years in confinement. His convictions and sentences were affirmed by this court on direct appeal. *State v. Michael Wayne Robinson, Jr.*, No. W2019-00216-CCA-R3-CD, 2019 WL 6876778, at *1 (Tenn. Crim. App. Dec. 16, 2019), *perm.*

*app. denied* (Tenn. Mar. 23, 2021). Our supreme court subsequently denied the Petitioner's application for permission to appeal after the post-conviction court stayed the post-conviction proceedings and granted the Petitioner a delayed appeal to the supreme court. Order, *State v. Michael Wayne Robinson*, *Jr.*, No. W2019-00216-SC-R11-CD (Tenn. Mar. 23, 2021).

The Petitioner's convictions stemmed from his actions on April 30, 2017, after he and Mr. Jerry Hennings pulled up in a red Altima near the Jackson residence of Mr. Melvin Owens. *Michael Wayne Robinson, Jr.*, 2019 WL 6876778, at *1. The Petitioner and Mr. Hennings exited the vehicle, and the Petitioner, who was armed with a handgun, began fighting with Mr. Sedarian Douglas, who was standing in the front yard of Mr. Owens's home. *Id.* At the time, Mr. Owens was talking to his daughter, Ms. Jameka Jackson, who was parked in front of the home in a vehicle in which her three young children and her fifteen-year-old nephew, Cameron Riley, were sitting. *Id.* A few seconds after Mr. Owens told the Petitioner and Mr. Douglas to stop disrespecting his house by fighting, the Petitioner started shooting. *Id.*

Ms. Jackson managed to make it inside her father's house, where she called 911 and described the shooter as a "black male with braids wearing a white shirt." *Id.* Before departing in the vehicle with Mr. Hennings, the Petitioner threatened that he would return and kill everyone present. *Id.* A short time later, a Jackson police officer spotted a vehicle that matched the description of the suspect vehicle, followed it, and saw two men who matched Ms. Jackson's descriptions of the shooter and his companion walk from the vehicle into a house. *Id.* Other officers arrived, and the Petitioner was eventually apprehended after he fled from the rear of the house. *Id.* Inside the house, officers recovered a .45 caliber Hi-Point semi-automatic pistol with an extended magazine that contained two rounds and another round half-way in the chamber. *Id.* at *2. "The brands in the pistol were RNP and PMC." *Id.* At the shooting scene, officers recovered four .45 millimeter shell casings from two different brands, RNP and PMC. *Id.* at *1.

Ms. Jackson identified the Petitioner as the shooter from a photographic array she was shown by the police. *Id.* at *2. Mr. Riley and Mr. Owens were also each shown photographic arrays of possible suspects. *Id.* Mr. Riley identified the Petitioner "as someone who 'look[ed] like the guy who was shooting,'" and Mr. Owens identified Mr. Hennings as a person who was 'present at the scene' but not the shooter." *Id.* Mr. Douglas, the man with whom the Petitioner had been fighting, refused to cooperate with the police. *Id.*

In an interview with the police, the Petitioner, after an initial denial, eventually admitted he had been present at the scene but claimed that Mr. Hennings was the man who

was fighting with Mr. Douglas. *Id.* He also claimed that there were several different individuals shooting guns that day but he was not one of them. *Id.*

On July 16, 2020, the Petitioner filed a *pro se* motion of ineffective assistance of counsel, which the post-conviction court treated as a petition for post-conviction relief. Following the appointment of post-conviction counsel, the Petitioner filed amended petitions in which he alleged that trial counsel was ineffective for, among other things, failing to argue at trial the lack of video, fingerprint, ballistic, or DNA evidence linking the Petitioner to the crimes, failing to retain an investigator to research the backgrounds of the State's witnesses in order to prepare an adequate defense, failing to adequately cross-examine State's witnesses, failing to withdraw due to a conflict of interest, and failing to adequately communicate with the Petitioner.

At the evidentiary hearing, the Petitioner testified that he was unhappy when trial counsel, a public defender, was appointed to represent him in the instant case because he had filed bar complaints against trial counsel based on counsel's representation of him in a 2013 case. The Petitioner, therefore, hired his own attorney to replace trial counsel. That attorney, however, was later allowed to withdraw from representation due to a conflict, and trial counsel was again appointed to represent the Petitioner in 2018.

The Petitioner claimed that he attempted on numerous occasions to get in touch with trial counsel, but counsel was never in his office. He said trial counsel came to his home to see him on the day before the start of trial but did not talk about the case. Instead, trial counsel merely told him that he would see him in court the next day. The Petitioner also claimed that trial counsel never shared discovery with him and never discussed his defense strategy for the trial. The Petitioner testified that he gave trial counsel a list of questions he wanted trial counsel to ask the State's witnesses, but trial counsel kept telling him to be quiet when he attempted to bring them to counsel's attention during the trial.

According to the Petitioner, his trial originally ended in a mistrial, with one of the twelve jurors voting to acquit him, as reflected on the verdict forms. He said the jurors voted again, and the second time scribbled through the not guilty boxes on the verdict forms to return with a verdict of guilty.

The Petitioner testified that he believed his trial would have ended in a mistrial had trial counsel made an argument to the jury about the lack of DNA, video, fingerprint and ballistics evidence. The Petitioner additionally complained that trial counsel failed to hire an investigator and failed to adequately cross-examine Ms. Jackson about the many different statements she had given. Had trial counsel hired an investigator and adequately cross-examined Ms. Jackson, the Petitioner believed that the State's witnesses, especially Ms. Jackson, would have been found by the jury not to be credible. Finally, the Petitioner

testified that he believed that trial counsel had a duty to withdraw from representation due to an ethical conflict, which the Petitioner based on the fact that he saw trial counsel and the prosecutor "talking and sniggling and giggling with each other" as the Petitioner entered the courtroom at the start of trial. The Petitioner testified that he believed trial counsel was "in cahoots" with the prosecutor to have the Petitioner convicted.

On cross-examination, the Petitioner acknowledged that trial counsel introduced the 911 operator and the 911 tape that showed that Ms. Jackson's description of the shooter as a "black male with braids" was inconsistent with the Petitioner's appearance. He further acknowledged that trial counsel pointed out to the jury the inconsistencies between the testimony that witnesses provided at the preliminary hearing versus the trial.

Trial counsel testified that he was an assistant public defender and was initially appointed to represent the Petitioner after the Petitioner had been arraigned. He recalled that the Petitioner then hired his own counsel, who later withdrew from representation, which led to trial counsel's being reappointed to the case. Trial counsel said he knew at the time he was appointed that the Petitioner was familiar to him and that he may have represented him in the past. He could not, however, recall any disagreements they had and was unaware of any issues that would have prevented him from effectively representing the Petitioner in the instant case. He stated that the Petitioner never had any conversations with him about their not having gotten along in a previous case.

Trial counsel could not recall the Petitioner's giving him a list of proposed questions for the witnesses but said it was possible he did, as it was a common occurrence with clients. Although he had no specific memory of it in the Petitioner's case, his common practice was to review the proposed questions and to communicate to his clients which issues he would address and which issues were improper, inadmissible, or bad trial strategy. He also commonly informed his clients that he might not word his questions exactly as the clients did but he would address the relevant issues.

Trial counsel testified that the State had an open file discovery policy. He recalled that the Petitioner, who was out on bond, came to his office, where he and the Petitioner discussed the case and reviewed discovery, including at least one video of a potential witness. Trial counsel further recalled that, as the trial date approached, he tried unsuccessfully on several occasions to reach the Petitioner on his cell phone. Concerned at his inability to reach the Petitioner, trial counsel went on the day before trial to the address in the Petitioner's file and spoke with the Petitioner's mother, who contacted the Petitioner. The Petitioner arrived, and trial counsel reminded him of the trial, reviewed the defense strategy, and asked the Petitioner if there were issues that the Petitioner wanted him to review. According to trial counsel, the Petitioner indicated that he felt comfortable

and was ready for trial. Based on the Petitioner's responses, trial counsel believed that the Petitioner trusted him to handle the trial.

Trial counsel had no memory of the jury being deadlocked or any grounds for a mistrial. He said that, had there been any grounds for a mistrial, he would have requested one. When shown copies of the verdict forms, trial counsel stated that it appeared to him that the jury foreperson initially checked the not guilty box, scratched it out, initialed the scratched-out portion, and then checked the guilty box. Trial counsel said he had some memory of the jury's expressing confusion on how to fill out the verdict forms and the trial court's addressing the jury on that issue after it held a sidebar with counsel.

On cross-examination, trial counsel, who said he had been practicing law for seventeen years, agreed that he had to use his discretion as to which questions to ask the witnesses to avoid opening the door to evidence that he did not want to come in. He further agreed that the Petitioner was free to visit him at his office if he had any issues he wanted to discuss. Trial counsel recalled that, in addition to the Petitioner, he spoke on more than one occasion with several of the Petitioner's family members, including the Petitioner's grandmother, who was very supportive of the Petitioner.

Trial counsel recalled requesting the services of the public defender's investigator but could not recall if he ever utilized the investigator's services. He did recall that he himself ran a background check on Mr. Owens, Ms. Jackson, and Mr. Riley to determine if they had any prior convictions he could use for impeachment purposes. As he recalled, Mr. Owens had prior convictions that were too old to be used for impeachment purposes, whereas neither Ms. Jackson nor Mr. Riley had any convictions.

Trial counsel agreed that there never was a not guilty verdict returned by the jury but simply a jury problem in correctly filling out the verdict forms. He testified that the trial court individually polled each juror after the verdicts were announced, and that each juror expressed his or her agreement with the guilty verdicts. Trial counsel testified that he held no animosity toward the Petitioner, either at the time of trial or at the post-conviction hearing.

The post-conviction court denied the petition in a lengthy oral ruling issued at the conclusion of the hearing, which it followed with a written order entered on August 4, 2021. The court accredited the testimony of trial counsel over that of the Petitioner, finding that trial counsel met with the Petitioner, reviewed discovery, and went the extra step of going to the Petitioner's home in order to keep the Petitioner informed of the defense strategy and the status of the case. The post-conviction court found that the Petitioner's allegation that trial counsel was ineffective for failing to argue the lack of fingerprint, DNA, video, or ballistics evidence linking the Petitioner to the crimes was meritless. The

court further found that the Petitioner failed to present any evidence in support of his allegation that trial counsel had a conflict of interest that affected his ability to represent the Petitioner and that the Petitioner failed to show that trial counsel was ineffective for failing to adequately cross-examine or impeach the State's witnesses.

## ANALYSIS

On appeal, the Petitioner contends that he satisfied both prongs of the *Strickland* test for ineffective assistance of counsel because he presented clear and convincing proof that the cumulative effect of trial counsel's deficiencies in not moving to withdraw from representation, not retaining the services of an investigator, and not adequately cross-examining the witnesses, prejudiced the outcome of his case. The State responds by arguing that the post-conviction court properly denied the petition because the Petitioner failed to show a deficiency in counsel's performance or prejudice to his case. We agree with the State.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Id.* However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.")

In support of his assertion that he presented clear and convincing evidence to demonstrate that trial counsel provided ineffective assistance, the Petitioner cites his own evidentiary hearing testimony. The post-conviction court, however, specifically accredited the testimony of trial counsel over that of the Petitioner, as was its prerogative. Trial counsel's testimony established that he communicated and reviewed with the Petitioner the State's evidence and the defense strategy, introduced the 911 tape in an attempt to cast doubt on the identification of the Petitioner as the shooter, cross-examined Ms. Jackson on her inconsistent descriptions, and pointed out the inconsistent statements and varied descriptions of the shooter to the jury. Trial counsel's testimony also established that he was unaware of the Petitioner's unhappiness with his prior representation and believed that

the Petitioner held trust in him as his counsel. The fact that trial counsel and the prosecutor may been chatting or joking with each other before the start of trial does not mean that trial counsel was not able to zealously represent the Petitioner and his interests in the case. The Petitioner has not shown that trial counsel was deficient in his representation or that he was prejudiced by counsel's alleged deficiencies. We, therefore, conclude that the post-conviction court properly denied the petition for post-conviction relief.

## CONCLUSION

After reviewing the record and finding no error, we affirm the judgment of the post-conviction court.

_____
JOHN W. CAMPBELL, SR., JUDGE